# EDWARDS, GOVERNOR OF LOUISIANA, ET AL. *v.* AGUILLARD ET AL.

No. 85–1513. Argued December 10, 1986—Decided June 19, 1987

BRENNAN, J., delivered the opinion of the Court, in which MARSHALL, BLACKMUN, POWELL, and STEVENS, JJ., joined, and in all but Part II of which O'CONNOR, J., joined. POWELL, J., filed a concurring opinion, in which O'CONNOR, J., joined, *post*, p. 597. WHITE, J., filed an opinion concurring in the judgment, *post*, p. 608. SCALIA, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 610.

*Wendell R. Bird*, Special Assistant Attorney General of Georgia, argued the cause for appellants. With him on the briefs were *A. Morgan Brian, Jr.*, and *Thomas T. Anderson*, Special Assistant Attorneys General, *Kendall L. Vick*, and

*Patricia Nalley Bowers,* Assistant Attorney General of Louisiana.

*Jay Topkis* argued the cause for appellees. With him on the brief was *John DiGiulio, Samuel I. Rosenberg, Allen Blumstein, Gerard E. Harper, Jack D. Novik, Burt Neuborne, Norman Dorsen, John Sexton,* and *Ron Wilson.**

JUSTICE BRENNAN delivered the opinion of the Court.†

The question for decision is whether Louisiana's "Balanced Treatment for Creation-Science and Evolution-Science in Public School Instruction" Act (Creationism Act), La. Rev. Stat. Ann. §§ 17:286.1–17:286.7 (West 1982), is facially in-

---

*Briefs of *amici curiae* urging reversal were filed for the Catholic League for Religious and Civil Rights by *Steven Frederick McDowell;* for the Christian Legal Society et al. by *Michael J. Woodruff, Kimberlee W. Colby, Samuel E. Ericsson,* and *Forest D. Montgomery;* and for Concerned Women for America by *Michael P. Farris* and *Jordan W. Lorence.*

Briefs of *amici curiae* urging affirmance were filed for the State of New York et al. by *Robert Abrams,* Attorney General of New York, *O. Peter Sherwood,* Solicitor General, *Paul M. Glickman, Jane Levine, Suzanne Lynn,* and *Marla Tepper,* Assistant Attorneys General, and *Neil F. Hartigan,* Attorney General of Illinois; for the American Association of University Professors et al. by *Ann H. Franke, Jacqueline W. Mintz,* and *Sheldon E. Steinbach;* for the American Federation of Teachers, AFL–CIO, by *Bruce A. Miller* and *Stuart M. Israel;* for the American Jewish Congress et al. by *Marvin E. Frankel, Marc D. Stern,* and *Ronald A. Krauss;* for Americans United for Separation of Church and State et al. by *Lee Boothby, Samuel Rabinove, Richard T. Foltin,* and *James M. Parker;* for the Anti-Defamation League of B'nai B'rith et al. by *Ruti G. Teitel, Justin J. Finger, Jeffrey P. Sinensky,* and *Steven M. Freeman;* for the National Academy of Sciences by *Barry H. Garfinkel* and *Mark Herlihy;* for the New York Committee for Public Education and Religious Liberty by *Leo Pfeffer;* for People for the American Way et al. by *Timothy B. Dyk, A. Douglas Melamed,* and *Kerry W. Kircher;* for the Spartacist League et al. by *Rachel H. Wolkenstein;* and for 72 Nobel Laureates et al. by *Walter B. Slocombe.*

Briefs of *amici curiae* were filed for the Rabbinical Alliance of America et al. by *John W. Whitehead* and *Larry L. Crain;* and for Reverend Bill McLean et al. by *Philip E. Kaplan.*

†JUSTICE O'CONNOR joins all but Part II of this opinion.

valid as violative of the Establishment Clause of the First Amendment.

## I

The Creationism Act forbids the teaching of the theory of evolution in public schools unless accompanied by instruction in "creation science." § 17:286.4A. No school is required to teach evolution or creation science. If either is taught, however, the other must also be taught. *Ibid.* The theories of evolution and creation science are statutorily defined as "the scientific evidences for [creation or evolution] and inferences from those scientific evidences." §§ 17.286.3(2) and (3).

Appellees, who include parents of children attending Louisiana public schools, Louisiana teachers, and religious leaders, challenged the constitutionality of the Act in District Court, seeking an injunction and declaratory relief.[1] Appellants, Louisiana officials charged with implementing the Act, defended on the ground that the purpose of the Act is to protect a legitimate secular interest, namely, academic freedom.[2] Appellees attacked the Act as facially invalid because

---

[1] Appellants, the Louisiana Governor, the Attorney General, the State Superintendent, the State Department of Education and the St. Tammany Parish School Board, agreed not to implement the Creationism Act pending the final outcome of this litigation. The Louisiana Board of Elementary and Secondary Education, and the Orleans Parish School Board were among the original defendants in the suit but both later realigned as plaintiffs.

[2] The District Court initially stayed the action pending the resolution of a separate lawsuit brought by the Act's legislative sponsor and others for declaratory and injunctive relief. After the separate suit was dismissed on jurisdictional grounds, *Keith* v. *Louisiana Department of Education*, 553 F. Supp. 295 (MD La. 1982), the District Court lifted its stay in this case and held that the Creationism Act violated the Louisiana Constitution. The court ruled that the State Constitution grants authority over the public school system to the Board of Elementary and Secondary Education rather than the state legislature. On appeal, the Court of Appeals certified the question to the Louisiana Supreme Court, which found the Creationism Act did not violate the State Constitution, *Aguillard* v. *Treen*, 440 So. 2d 704 (1983). The Court of Appeals then remanded the case

it violated the Establishment Clause and made a motion for summary judgment. The District Court granted the motion. *Aguillard* v. *Treen*, 634 F. Supp. 426 (ED La. 1985). The court held that there can be no valid secular reason for prohibiting the teaching of evolution, a theory historically opposed by some religious denominations. The court further concluded that "the teaching of 'creation-science' and 'creationism,' as contemplated by the statute, involves teaching 'tailored to the principles' of a particular religious sect or group of sects." *Id.*, at 427 (citing *Epperson* v. *Arkansas*, 393 U. S. 97, 106 (1968)). The District Court therefore held that the Creationism Act violated the Establishment Clause either because it prohibited the teaching of evolution or because it required the teaching of creation science with the purpose of advancing a particular religious doctrine.

The Court of Appeals affirmed. 765 F. 2d 1251 (CA5 1985). The court observed that the statute's avowed purpose of protecting academic freedom was inconsistent with requiring, upon risk of sanction, the teaching of creation science whenever evolution is taught. *Id.*, at 1257. The court found that the Louisiana Legislature's actual intent was "to discredit evolution by counterbalancing its teaching at every turn with the teaching of creationism, a religious belief." *Ibid.* Because the Creationism Act was thus a law furthering a particular religious belief, the Court of Appeals held that the Act violated the Establishment Clause. A suggestion for rehearing en banc was denied over a dissent. 778 F. 2d 225 (CA5 1985). We noted probable jurisdiction, 476 U. S. 1103 (1986), and now affirm.

## II

The Establishment Clause forbids the enactment of any law "respecting an establishment of religion."[3] The Court

---

to the District Court to determine whether the Creationism Act violates the Federal Constitution. *Aguillard* v. *Treen*, 720 F. 2d 676 (CA5 1983).

[3] The First Amendment states: "Congress shall make no law respecting an establishment of religion . . . ." Under the Fourteenth Amendment,

has applied a three-pronged test to determine whether legislation comports with the Establishment Clause. First, the legislature must have adopted the law with a secular purpose. Second, the statute's principal or primary effect must be one that neither advances nor inhibits religion. Third, the statute must not result in an excessive entanglement of government with religion. *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971).[4] State action violates the Establishment Clause if it fails to satisfy any of these prongs.

In this case, the Court must determine whether the Establishment Clause was violated in the special context of the public elementary and secondary school system. States and local school boards are generally afforded considerable discretion in operating public schools. See *Bethel School Dist. No. 403* v. *Fraser*, 478 U. S. 675, 683 (1986); *id.*, at 687 (BRENNAN, J., concurring in judgment); *Tinker* v. *Des Moines Independent Community School Dist.*, 393 U. S. 503, 507 (1969). "At the same time . . . we have necessarily recognized that the discretion of the States and local school boards in matters of education must be exercised in a manner that comports with the transcendent imperatives of the First Amendment." *Board of Education, Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U. S. 853, 864 (1982).

The Court has been particularly vigilant in monitoring compliance with the Establishment Clause in elementary and

---

this "fundamental concept of liberty" applies to the States. *Cantwell* v. *Connecticut*, 310 U. S. 296, 303 (1940).

[4] The *Lemon* test has been applied in all cases since its adoption in 1971, except in *Marsh* v. *Chambers*, 463 U. S. 783 (1983), where the Court held that the Nebraska Legislature's practice of opening a session with a prayer by a chaplain paid by the State did not violate the Establishment Clause. The Court based its conclusion in that case on the historical acceptance of the practice. Such a historical approach is not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted. See *Wallace* v. *Jaffree*, 472 U. S. 38, 80 (1985) (O'CONNOR, J., concurring in judgment) (citing *Abington School Dist.* v. *Schempp*, 374 U. S. 203, 238, and n. 7 (1963) (BRENNAN, J., concurring)).

secondary schools. Families entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family. Students in such institutions are impressionable and their attendance is involuntary. See, *e. g., Grand Rapids School Dist.* v. *Ball,* 473 U. S. 373, 383 (1985); *Wallace* v. *Jaffree,* 472 U. S. 38, 60, n. 51 (1985); *Meek* v. *Pittenger,* 421 U. S. 349, 369 (1975); *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 252–253 (1963) (BRENNAN, J., concurring). The State exerts great authority and coercive power through mandatory attendance requirements, and because of the students' emulation of teachers as role models and the children's susceptibility to peer pressure.[5] See *Bethel School Dist. No. 403* v. *Fraser, supra,* at 683; *Wallace* v. *Jaffree, supra,* at 81 (O'CONNOR, J., concurring in judgment). Furthermore, "[t]he public school is at once the symbol of our democracy and the most pervasive means for promoting our common destiny. In no activity of the State is it more vital to keep out divisive forces than in its schools . . . ." *Illinois ex rel. McCollum* v. *Board of Education,* 333 U. S. 203, 231 (1948) (opinion of Frankfurter, J.).

Consequently, the Court has been required often to invalidate statutes which advance religion in public elementary and secondary schools. See, *e. g., Grand Rapids School Dist.* v. *Ball, supra* (school district's use of religious school teachers in public schools); *Wallace* v. *Jaffree, supra* (Alabama statute authorizing moment of silence for school prayer); *Stone* v.

---

[5] The potential for undue influence is far less significant with regard to college students who voluntarily enroll in courses. "This distinction warrants a difference in constitutional results." *Abington School Dist.* v. *Schempp, supra,* at 253 (BRENNAN, J., concurring). Thus, for instance, the Court has not questioned the authority of state colleges and universities to offer courses on religion or theology. See *Widmar* v. *Vincent,* 454 U. S. 263, 271 (1981) (POWELL, J.); *id.,* at 281 (STEVENS, J., concurring in judgment).

*Graham*, 449 U. S. 39 (1980) (posting copy of Ten Commandments on public classroom wall); *Epperson* v. *Arkansas*, 393 U. S. 97 (1968) (statute forbidding teaching of evolution); *Abington School Dist.* v. *Schempp, supra* (daily reading of Bible); *Engel* v. *Vitale*, 370 U. S. 421, 430 (1962) (recitation of "denominationally neutral" prayer).

Therefore, in employing the three-pronged *Lemon* test, we must do so mindful of the particular concerns that arise in the context of public elementary and secondary schools. We now turn to the evaluation of the Act under the *Lemon* test.

## III

*Lemon*'s first prong focuses on the purpose that animated adoption of the Act. "The purpose prong of the *Lemon* test asks whether government's actual purpose is to endorse or disapprove of religion." *Lynch* v. *Donnelly*, 465 U. S. 668, 690 (1984) (O'CONNOR, J., concurring). A governmental intention to promote religion is clear when the State enacts a law to serve a religious purpose. This intention may be evidenced by promotion of religion in general, see *Wallace* v. *Jaffree, supra*, at 52–53 (Establishment Clause protects individual freedom of conscience "to select any religious faith or none at all"), or by advancement of a particular religious belief, *e. g., Stone* v. *Graham, supra*, at 41 (invalidating requirement to post Ten Commandments, which are "undeniably a sacred text in the Jewish and Christian faiths") (footnote omitted); *Epperson* v. *Arkansas, supra*, at 106 (holding that banning the teaching of evolution in public schools violates the First Amendment since "teaching and learning" must not "be tailored to the principles or prohibitions of any religious sect or dogma"). If the law was enacted for the purpose of endorsing religion, "no consideration of the second or third criteria [of *Lemon*] is necessary." *Wallace* v. *Jaffree, supra*, at 56. In this case, appellants have identified no clear secular purpose for the Louisiana Act.

True, the Act's stated purpose is to protect academic freedom. La. Rev. Stat. Ann. § 17:286.2 (West 1982). This phrase might, in common parlance, be understood as referring to enhancing the freedom of teachers to teach what they will. The Court of Appeals, however, correctly concluded that the Act was not designed to further that goal.[6] We find no merit in the State's argument that the "legislature may not [have] use[d] the terms 'academic freedom' in the correct legal sense. They might have [had] in mind, instead, a basic concept of fairness; teaching all of the evidence." Tr. of Oral Arg. 60. Even if "academic freedom" is read to mean "teaching all of the evidence" with respect to the origin of human beings, the Act does not further this purpose. The goal of providing a more comprehensive science curriculum is not furthered either by outlawing the teaching of evolution or by requiring the teaching of creation science.

## A

While the Court is normally deferential to a State's articulation of a secular purpose, it is required that the statement

---

[6] The Court of Appeals stated that "[a]cademic freedom embodies the principle that individual instructors are at liberty to teach that which they deem to be appropriate in the exercise of their professional judgment." 765 F. 2d, at 1257. But, in the State of Louisiana, courses in public schools are prescribed by the State Board of Education and teachers are not free, absent permission, to teach courses different from what is required. Tr. of Oral Arg. 44–46. "Academic freedom," at least as it is commonly understood, is not a relevant concept in this context. Moreover, as the Court of Appeals explained, the Act "requires, presumably upon risk of *sanction* or *dismissal* for failure to comply, the teaching of creation-science whenever evolution is taught. Although states may prescribe public school curriculum concerning science instruction under ordinary circumstances, the compulsion inherent in the Balanced Treatment Act is, on its face, inconsistent with the idea of academic freedom as it is universally understood." 765 F. 2d, at 1257 (emphasis in original). The Act actually serves to diminish academic freedom by removing the flexibility to teach evolution without also teaching creation science, even if teachers determine that such curriculum results in less effective and comprehensive science instruction.

of such purpose be sincere and not a sham. See *Wallace* v. *Jaffree*, 472 U. S., at 64 (POWELL, J., concurring); *id.*, at 75 (O'CONNOR, J., concurring in judgment); *Stone* v. *Graham*, *supra*, at 41; *Abington School Dist.* v. *Schempp*, 374 U. S., at 223–224. As JUSTICE O'CONNOR stated in *Wallace:* "It is not a trivial matter, however, to require that the legislature manifest a secular purpose and omit all sectarian endorsements from its laws. That requirement is precisely tailored to the Establishment Clause's purpose of assuring that Government not intentionally endorse religion or a religious practice." 472 U. S., at 75 (concurring in judgment).

It is clear from the legislative history that the purpose of the legislative sponsor, Senator Bill Keith, was to narrow the science curriculum. During the legislative hearings, Senator Keith stated: "My preference would be that neither [creationism nor evolution] be taught." 2 App. E–621. Such a ban on teaching does not promote—indeed, it undermines— the provision of a comprehensive scientific education.

It is equally clear that requiring schools to teach creation science with evolution does not advance academic freedom. The Act does not grant teachers a flexibility that they did not already possess to supplant the present science curriculum with the presentation of theories, besides evolution, about the origin of life. Indeed, the Court of Appeals found that no law prohibited Louisiana public school teachers from teaching any scientific theory. 765 F. 2d, at 1257. As the president of the Louisiana Science Teachers Association testified, "[a]ny scientific concept that's based on established fact can be included in our curriculum already, and no legislation allowing this is necessary." 2 App. E–616. The Act provides Louisiana schoolteachers with no new authority. Thus the stated purpose is not furthered by it.

The Alabama statute held unconstitutional in *Wallace* v. *Jaffree, supra,* is analogous. In *Wallace,* the State characterized its new law as one designed to provide a 1-minute period for meditation. We rejected that stated purpose as in-

sufficient, because a previously adopted Alabama law already provided for such a 1-minute period. Thus, in this case, as in *Wallace,* "[a]ppellants have not identified any secular purpose that was not fully served by [existing state law] before the enactment of [the statute in question]." 472 U. S., at 59.

Furthermore, the goal of basic "fairness" is hardly furthered by the Act's discriminatory preference for the teaching of creation science and against the teaching of evolution.[7] While requiring that curriculum guides be developed for creation science, the Act says nothing of comparable guides for evolution. La. Rev. Stat. Ann. § 17:286.7A (West 1982). Similarly, resource services are supplied for creation science but not for evolution. § 17:286.7B. Only "creation scientists" can serve on the panel that supplies the resource services. *Ibid.* The Act forbids school boards to discriminate against anyone who "chooses to be a creation-scientist" or to teach "creationism," but fails to protect those who choose to teach evolution or any other noncreation science theory, or who refuse to teach creation science. § 17:286.4C.

If the Louisiana Legislature's purpose was solely to maximize the comprehensiveness and effectiveness of science instruction, it would have encouraged the teaching of all scientific theories about the origins of humankind.[8] But under

---

[7] The Creationism Act's provisions appear among other provisions prescribing the courses of study in Louisiana's public schools. These other provisions, similar to those in other States, prescribe courses of study in such topics as driver training, civics, the Constitution, and free enterprise. None of these other provisions, apart from those associated with the Creationism Act, nominally mandates "equal time" for opposing opinions within a specific area of learning. See, *e. g.,* La. Rev. Stat. Ann. §§ 17:261–17:281 (West 1982 and Supp. 1987).

[8] The dissent concludes that the Act's purpose was to protect the academic freedom of students, and not that of teachers. *Post,* at 628. Such a view is not at odds with our conclusion that if the Act's purpose was to provide comprehensive scientific education (a concern shared by students and teachers, as well as parents), that purpose was not advanced by the statute's provisions. *Supra,* at 587.

the Act's requirements, teachers who were once free to teach any and all facets of this subject are now unable to do so. Moreover, the Act fails even to ensure that creation science will be taught, but instead requires the teaching of this theory only when the theory of evolution is taught. Thus we agree with the Court of Appeals' conclusion that the Act does not serve to protect academic freedom, but has the distinctly different purpose of discrediting "evolution by counterbalancing its teaching at every turn with the teaching of creationism . . . ." 765 F. 2d, at 1257.

B

*Stone* v. *Graham* invalidated the State's requirement that the Ten Commandments be posted in public classrooms. "The Ten Commandments are undeniably a sacred text in the Jewish and Christian faiths, and no legislative recitation of a supposed secular purpose can blind us to that fact." 449 U. S., at 41 (footnote omitted). As a result, the contention that the law was designed to provide instruction on a "fundamental legal code" was "not sufficient to avoid conflict with the First Amendment." *Ibid.* Similarly *Abington School Dist.* v. *Schempp* held unconstitutional a statute "requiring the selection and reading at the opening of the school day of verses from the Holy Bible and the recitation of the Lord's Prayer by the students in unison," despite the proffer of such secular purposes as the "promotion of moral values, the con-

---

Moreover, it is astonishing that the dissent, to prove its assertion, relies on a section of the legislation that was eventually deleted by the legislature. Compare § 3702 in 1 App. E–292 (text of section prior to amendment) with La. Rev. Stat. Ann. § 17:286.2 (West 1982). The dissent contends that this deleted section—which was explicitly rejected by the Louisiana Legislature—reveals the legislature's "obviously intended meaning of the statutory terms 'academic freedom.'" *Post,* at 628. Quite to the contrary, Boudreaux, the main expert relied on by the sponsor of the Act, cautioned the legislature that the words "academic freedom" meant "freedom to teach science." 1 App. E–429. His testimony was given at the time the legislature was deciding whether to delete this section of the Act.

tradiction to the materialistic trends of our times, the perpetuation of our institutions and the teaching of literature." 374 U. S., at 223.

As in *Stone* and *Abington*, we need not be blind in this case to the legislature's preeminent religious purpose in enacting this statute. There is a historic and contemporaneous link between the teachings of certain religious denominations and the teaching of evolution.[9] It was this link that concerned the Court in *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), which also involved a facial challenge to a statute regulating the teaching of evolution. In that case, the Court reviewed an Arkansas statute that made it unlawful for an instructor to teach evolution or to use a textbook that referred to this scientific theory. Although the Arkansas antievolution law did not explicitly state its predominate religious purpose, the Court could not ignore that "[t]he statute was a product of the upsurge of 'fundamentalist' religious fervor" that has long viewed this particular scientific theory as contradicting the literal interpretation of the Bible. *Id.*, at 98, 106–107.[10] After reviewing the history of antievolution statutes, the Court determined that "there can be no doubt that the motivation for the [Arkansas] law was the same [as other antievolution statutes]: to suppress the teaching of a theory which, it was thought, 'denied' the divine creation of man." *Id.*, at 109. The Court found that there can be no legitimate

---

[9] See *McLean* v. *Arkansas Bd. of Ed.*, 529 F. Supp. 1255, 1258–1264 (ED Ark. 1982) (reviewing historical and contemporary antagonisms between the theory of evolution and religious movements).

[10] The Court evaluated the statute in light of a series of antievolution statutes adopted by state legislatures dating back to the Tennessee statute that was the focus of the celebrated *Scopes* trial in 1925. *Epperson* v. *Arkansas*, 393 U. S., at 98, 101, n. 8, and 109. The Court found the Arkansas statute comparable to this Tennessee "monkey law," since both gave preference to " 'religious establishments which have as one of their tenets or dogmas the instantaneous creation of man.' " *Id.*, at 103, n. 11 (quoting *Scopes* v. *State*, 154 Tenn. 105, 126, 289 S. W. 363, 369 (1927) (Chambliss, J., concurring)).

state interest in protecting particular religions from scientific views "distasteful to them," *id.*, at 107 (citation omitted), and concluded "that the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma," *id.*, at 106.

These same historic and contemporaneous antagonisms between the teachings of certain religious denominations and the teaching of evolution are present in this case. The preeminent purpose of the Louisiana Legislature was clearly to advance the religious viewpoint that a supernatural being created humankind.[11] The term "creation science" was defined as embracing this particular religious doctrine by those responsible for the passage of the Creationism Act. Senator Keith's leading expert on creation science, Edward Boudreaux, testified at the legislative hearings that the theory of creation science included belief in the existence of a supernatural creator. See 1 App. E–421—E–422 (noting that "creation scientists" point to high probability that life was "created by an intelligent mind").[12] Senator Keith also cited testimony from other experts to support the creation-science view that "a creator [was] responsible for the universe and everything in it."[13] 2 App. E–497. The legislative history

---

[11] While the belief in the instantaneous creation of humankind by a supernatural creator may require the rejection of every aspect of the theory of evolution, an individual instead may choose to accept some or all of this scientific theory as compatible with his or her spiritual outlook. See Tr. of Oral Arg. 23–29.

[12] Boudreaux repeatedly defined creation science in terms of a theory that supports the existence of a supernatural creator. See, *e. g.*, 2 App. E–501—E–502 (equating creation science with a theory pointing "to conditions of a creator"); 1 App. E–153—E–154 ("Creation . . . requires the direct involvement of a supernatural intelligence"). The lead witness at the hearings introducing the original bill, Luther Sunderland, described creation science as postulating "that everything was created by some intelligence or power external to the universe." *Id.*, at E–9—E–10.

[13] Senator Keith believed that creation science embodied this view: "One concept is that a creator however you define a creator was responsible for

therefore reveals that the term "creation science," as contemplated by the legislature that adopted this Act, embodies the religious belief that a supernatural creator was responsible for the creation of humankind.

Furthermore, it is not happenstance that the legislature required the teaching of a theory that coincided with this religious view. The legislative history documents that the Act's primary purpose was to change the science curriculum of public schools in order to provide persuasive advantage to a particular religious doctrine that rejects the factual basis of evolution in its entirety. The sponsor of the Creationism Act, Senator Keith, explained during the legislative hearings that his disdain for the theory of evolution resulted from the support that evolution supplied to views contrary to his own religious beliefs. According to Senator Keith, the theory of evolution was consonant with the "cardinal principle[s] of religious humanism, secular humanism, theological liberalism, aetheistism *[sic]*." 1 App. E–312—E–313; see also 2 App. E–499—E–500. The state senator repeatedly stated that scientific evidence supporting his religious views should be included in the public school curriculum to redress the fact that the theory of evolution incidentally coincided with what he characterized as religious beliefs antithetical to his own.[14]

---

everything that is in this world. The other concept is that it just evolved." *Id.*, at E–280. Besides Senator Keith, several of the most vocal legislators also revealed their religious motives for supporting the bill in the official legislative history. See, *e. g.*, *id.*, at E–441, E–443 (Sen. Saunders noting that bill was amended so that teachers could refer to the Bible and other religious texts to support the creation-science theory); 2 App. E–561—E–562, E–610 (Rep. Jenkins contending that the existence of God was a scientific fact).

[14] See, *e. g.*, 1 App. E–74—E–75 (noting that evolution is contrary to his family's religious beliefs); *id.*, at E–313 (contending that evolution advances religions contrary to his own); *id.*, at E–357 (stating that evolution is "almost a religion" to science teachers); *id.*, at E–418 (arguing that evolution is cornerstone of some religions contrary to his own); 2 App. E–763—E–764 (author of model bill, from which Act is derived, sent copy of the model bill to Senator Keith and advised that "I view this whole battle as

The legislation therefore sought to alter the science curriculum to reflect endorsement of a religious view that is antagonistic to the theory of evolution.

In this case, the purpose of the Creationism Act was to restructure the science curriculum to conform with a particular religious viewpoint. Out of many possible science subjects taught in the public schools, the legislature chose to affect the teaching of the one scientific theory that historically has been opposed by certain religious sects. As in *Epperson,* the legislature passed the Act to give preference to those religious groups which have as one of their tenets the creation of humankind by a divine creator. The "overriding fact" that confronted the Court in *Epperson* was "that Arkansas' law selects from the body of knowledge a particular segment which it proscribes for the sole reason that it is deemed to conflict with . . . a particular interpretation of the Book of Genesis by a particular religious group." 393 U. S., at 103. Similarly, the Creationism Act is designed *either* to promote the theory of creation science which embodies a particular religious tenet by requiring that creation science be taught whenever evolution is taught *or* to prohibit the teaching of a scientific theory disfavored by certain religious sects by forbidding the teaching of evolution when creation science is not also taught. The Establishment Clause, however, "forbids *alike* the preference of a religious doctrine *or* the prohibition of theory which is deemed antagonistic to a particular dogma." *Id.,* at 106–107 (emphasis added). Because the primary purpose of the Creationism Act is to advance a particular religious belief, the Act endorses religion in violation of the First Amendment.

We do not imply that a legislature could never require that scientific critiques of prevailing scientific theories be taught. Indeed, the Court acknowledged in *Stone* that its decision

one between God and anti-God forces . . . . [I]f evolution is permitted to continue . . . it will continue to be made to appear that a Supreme Being is unnecessary . . .").

forbidding the posting of the Ten Commandments did not mean that no use could ever be made of the Ten Commandments, or that the Ten Commandments played an exclusively religious role in the history of Western Civilization. 449 U. S., at 42. In a similar way, teaching a variety of scientific theories about the origins of humankind to schoolchildren might be validly done with the clear secular intent of enhancing the effectiveness of science instruction. But because the primary purpose of the Creationism Act is to endorse a particular religious doctrine, the Act furthers religion in violation of the Establishment Clause.[15]

## IV

Appellants contend that genuine issues of material fact remain in dispute, and therefore the District Court erred in granting summary judgment. Federal Rule of Civil Procedure 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A court's finding of improper purpose behind a statute is appropriately determined by the statute on its face, its legislative history, or its interpretation by a responsible administrative agency. See, *e. g., Wallace* v. *Jaffree,* 472 U. S., at 56–61; *Stone* v. *Graham,* 449 U. S., at 41–42; *Epperson* v. *Arkansas,* 393 U. S., at 103–109. The plain meaning of the statute's words, enlightened by their context and the contemporaneous legislative history, can control the determination of legislative purpose. See *Wallace* v. *Jaffree, supra,* at 74 (O'CONNOR, J., concurring in judgment); *Richards* v. *United States,* 369 U. S. 1, 9 (1962); *Jay*

---

[15] Neither the District Court nor the Court of Appeals found a clear secular purpose, while both agreed that the Creationism Act's primary purpose was to advance religion. "When both courts below are unable to discern an arguably valid secular purpose, this Court normally should hesitate to find one." *Wallace* v. *Jaffree,* 472 U. S., at 66 (POWELL, J., concurring).

v. *Boyd*, 351 U. S. 345, 357 (1956). Moreover, in determining the legislative purpose of a statute, the Court has also considered the historical context of the statute, *e. g., Epperson* v. *Arkansas, supra,* and the specific sequence of events leading to passage of the statute, *e. g., Arlington Heights* v. *Metropolitan Housing Dev. Corp.,* 429 U. S. 252 (1977).

In this case, appellees' motion for summary judgment rested on the plain language of the Creationism Act, the legislative history and historical context of the Act, the specific sequence of events leading to the passage of the Act, the State Board's report on a survey of school superintendents, and the correspondence between the Act's legislative sponsor and its key witnesses. Appellants contend that affidavits made by two scientists, two theologians, and an education administrator raise a genuine issue of material fact and that summary judgment was therefore barred. The affidavits define creation science as "origin through abrupt appearance in complex form" and allege that such a viewpoint constitutes a true scientific theory. See App. to Brief for Appellants A–7 to A–40.

We agree with the lower courts that these affidavits do not raise a genuine issue of material fact. The existence of "uncontroverted affidavits" does not bar summary judgment.[16] Moreover, the postenactment testimony of outside experts is of little use in determining the Louisiana Legislature's purpose in enacting this statute. The Louisiana Legislature did hear and rely on scientific experts in passing the bill,[17] but none of the persons making the affidavits produced by the ap-

---

[16] There is "no express or implied requirement in Rule 56 that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex Corp.* v. *Catrett,* 477 U. S. 317, 323 (1986) (emphasis in original).

[17] The experts, who were relied upon by the sponsor of the bill and the legislation's other supporters, testified that creation science embodies the religious view that there is a supernatural creator of the universe. See, *supra,* at 591–592.

pellants participated in or contributed to the enactment of the law or its implementation.[18] The District Court, in its discretion, properly concluded that a Monday-morning "battle of the experts" over possible technical meanings of terms in the statute would not illuminate the contemporaneous purpose of the Louisiana Legislature when it made the law.[19] We therefore conclude that the District Court did not err in finding that appellants failed to raise a genuine issue of material fact, and in granting summary judgment.[20]

## V

The Louisiana Creationism Act advances a religious doctrine by requiring either the banishment of the theory of evolution from public school classrooms or the presentation of a religious viewpoint that rejects evolution in its entirety.

---

[18] Appellants contend that the affidavits are relevant because the term "creation science" is a technical term similar to that found in statutes that regulate certain scientific or technological developments. Even assuming, *arguendo*, that "creation science" is a term of art as represented by appellants, the definition provided by the relevant agency provides a better insight than the affidavits submitted by appellants in this case. In a 1981 survey conducted by the Louisiana Department of Education, the school superintendents in charge of implementing the provisions of the Creationism Act were asked to interpret the meaning of "creation science" as used in the statute. About 75 percent of Louisiana's superintendents stated that they understood "creation science" to be a religious doctrine. 2 App. E–798—E–799. Of this group, the largest proportion of superintendents interpreted creation science, as defined by the Act, to mean the literal interpretation of the Book of Genesis. The remaining superintendents believed that the Act required teaching the view that "the universe was made by a creator." *Id.*, at E–799.

[19] The Court has previously found the postenactment elucidation of the meaning of a statute to be of little relevance in determining the intent of the legislature contemporaneous to the passage of the statute. See *Wallace* v. *Jaffree*, 472 U. S., at 57, n. 45; *id.*, at 75 (O'CONNOR, J., concurring in judgment).

[20] Numerous other Establishment Clause cases that found state statutes to be unconstitutional have been disposed of without trial. *E. g.*, *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116 (1982); *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971); *Engel* v. *Vitale*, 370 U. S. 421 (1962).

The Act violates the Establishment Clause of the First Amendment because it seeks to employ the symbolic and financial support of government to achieve a religious purpose. The judgment of the Court of Appeals therefore is

*Affirmed.*

JUSTICE POWELL, with whom JUSTICE O'CONNOR joins, concurring.

I write separately to note certain aspects of the legislative history, and to emphasize that nothing in the Court's opinion diminishes the traditionally broad discretion accorded state and local school officials in the selection of the public school curriculum.

I

This Court consistently has applied the three-pronged test of *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971), to determine whether a particular state action violates the Establishment Clause of the Constitution.[1] See, *e. g.*, *Grand Rapids School Dist.* v. *Ball*, 473 U. S. 373, 383 (1985) ("We have particularly relied on *Lemon* in every case involving the sensitive relationship between government and religion in the education of our children"). The first requirement of the *Lemon* test is that the challenged statute have a "secular legislative purpose." *Lemon* v. *Kurtzman, supra,* at 612. See *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S. 756, 773 (1973). If no valid secular purpose can be identified, then the statute violates the Establishment Clause.

A

"The starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps* v. *Manor Drug Stores*, 421 U. S. 723, 756 (1975) (POWELL, J.,

---

[1] As the Court recognizes, *ante*, at 583, n. 4, the one exception to this consistent application of the *Lemon* test is *Marsh* v. *Chambers*, 463 U. S. 783 (1983).

concurring). The Balanced Treatment for Creation-Science and Evolution-Science Act (Act or Balanced Treatment Act), La. Rev. Stat. Ann. § 17:286.1 *et seq.* (West 1982), provides in part:

> "[P]ublic schools within [the] state shall give balanced treatment to creation-science and to evolution-science. Balanced treatment of these two models shall be given in classroom lectures taken as a whole for each course, in textbook materials taken as a whole for each course, in library materials taken as a whole for the sciences and taken as a whole for the humanities, and in other educational programs in public schools, to the extent that such lectures, textbooks, library materials, or educational programs deal in any way with the subject of the origin of man, life, the earth, or the universe. When creation or evolution is taught, each shall be taught as a theory, rather than as proven scientific fact." § 17:286.4(A).

"Balanced treatment" means "providing whatever information and instruction in both creation and evolution models the classroom teacher determines is necessary and appropriate to provide insight into both theories in view of the textbooks and other instructional materials available for use in his classroom." § 17:286.3(1). "Creation-science" is defined as "the scientific evidences for creation and inferences from those scientific evidences." § 17:286.3(2). "Evolution-science" means "the scientific evidences for evolution and inferences from those scientific evidences." § 17:286.3(3).

Although the Act requires the teaching of the scientific evidences of both creation and evolution whenever either is taught, it does not define either term. "A fundamental canon of statutory construction is that, unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning." *Perrin* v. *United States,* 444 U. S. 37, 42 (1979). The "doctrine or theory of creation" is commonly defined as "holding that matter, the various forms of life, and the world were created by a transcendent God out

of nothing." Webster's Third New International Dictionary 532 (unabridged 1981). "Evolution" is defined as "the theory that the various types of animals and plants have their origin in other preexisting types, the distinguishable differences being due to modifications in successive generations." *Id.*, at 789. Thus, the Balanced Treatment Act mandates that public schools present the scientific evidence to support a theory of divine creation whenever they present the scientific evidence to support the theory of evolution. "[C]oncepts concerning God or a supreme being of some sort are manifestly religious . . . . These concepts do not shed that religiosity merely because they are presented as a philosophy or as a science." *Malnak* v. *Yogi*, 440 F. Supp. 1284, 1322 (NJ 1977), aff'd *per curiam*, 592 F. 2d 197 (CA3 1979). From the face of the statute, a purpose to advance a religious belief is apparent.

A religious purpose alone is not enough to invalidate an act of a state legislature. The religious purpose must predominate. See *Wallace* v. *Jaffree*, 472 U. S. 38, 56 (1985); *id.*, at 64 (POWELL, J., concurring); *Lynch* v. *Donnelly*, 465 U. S. 668, 681, n. 6 (1984). The Act contains a statement of purpose: to "protec[t] academic freedom." § 17:286.2. This statement is puzzling. Of course, the "academic freedom" of teachers to present information in public schools, and students to receive it, is broad. But it necessarily is circumscribed by the Establishment Clause. "Academic freedom" does not encompass the right of a legislature to structure the public school curriculum in order to advance a particular religious belief. *Epperson* v. *Arkansas*, 393 U. S. 97, 106 (1968). Nevertheless, I read this statement in the Act as rendering the purpose of the statute at least ambiguous. Accordingly, I proceed to review the legislative history of the Act.

B

In June 1980, Senator Bill Keith introduced Senate Bill 956 in the Louisiana Legislature. The stated purpose of the bill

was to "assure academic freedom by requiring the teaching of the theory of creation ex nihilo in all public schools where the theory of evolution is taught." 1 App. E–1.[2] The bill defined the "theory of creation ex nihilo" as "the belief that the origin of the elements, the galaxy, the solar system, of life, of all the species of plants and animals, the origin of man, and the origin of all things and their processes and relationships were created ex nihilo and fixed by God." *Id.*, at E–1a— E–1b. This theory was referred to by Senator Keith as "scientific creationism." *Id.*, at E–2.

While a Senate committee was studying scientific creationism, Senator Keith introduced a second draft of the bill, requiring balanced treatment of "evolution-science" and "creation-science." *Id.*, at E–108. Although the Keith bill prohibited "instruction in any religious doctrine or materials," *id.*, at E–302, it defined "creation-science" to include

"the scientific evidences and related inferences that indicate (a) sudden creation of the universe, energy, and life from nothing; (b) the insufficiency of mutation and natural selection in bringing about development of all living kinds from a single organism; (c) changes only within fixed limits or originally created kinds of plants and animals; (d) separate ancestry for man and apes; (e) explanation of the earth's geology by catastrophism, including the occurrence of a worldwide flood; and (f) a

---

[2] Creation *"ex nihilo"* means creation "from nothing" and has been found to be an "inherently religious concept." *McLean* v. *Arkansas Board of Education*, 529 F. Supp. 1255, 1266 (ED Ark. 1982). The District Court in *McLean* found:

"The argument that creation from nothing in [§] 4(a)(1) [of the substantially similar Arkansas Balanced Treatment Act] does not involve a supernatural deity has no evidentiary or rational support. To the contrary, 'creation out of nothing' is a concept unique to Western religions. In traditional Western religious thought, the conception of a creator of the world is a conception of God. Indeed, creation of the world 'out of nothing' is the ultimate religious statement because God is the only actor." *Id.*, at 1265.

relatively recent inception of the earth and living kinds." *Id.*, at E–298—E–299.

Significantly, the model Act on which the Keith bill relied was also the basis for a similar statute in Arkansas. See *McLean* v. *Arkansas Board of Education*, 529 F. Supp. 1255 (ED Ark. 1982). The District Court in *McLean* carefully examined this model Act, particularly the section defining creation science, and concluded that "[b]oth [its] concepts and wording . . . convey an inescapable religiosity." *Id.*, at 1265. The court found that "[t]he ideas of [this section] are not merely similar to the literal interpretation of Genesis; they are identical and parallel to no other story of creation." *Ibid.*

The complaint in *McLean* was filed on May 27, 1981. On May 28, the Louisiana Senate committee amended the Keith bill to delete the illustrative list of scientific evidences. According to the legislator who proposed the amendment, it was "not intended to try to gut [the bill] in any way, or defeat the purpose [for] which Senator Keith introduced [it]," 1 App. E–432, and was not viewed as working "any violence to the bill." *Id.*, at E–438. Instead, the concern was "whether this should be an all inclusive list." *Ibid.*

The legislature then held hearings on the amended bill that became the Balanced Treatment Act under review. The principal creation scientist to testify in support of the Act was Dr. Edward Boudreaux. He did not elaborate on the nature of creation science except to indicate that the "scientific evidences" of the theory are "the objective information of science [that] point[s] to conditions of a creator." 2 *id.*, at E–501—E–502. He further testified that the recognized creation scientists in the United States, who "numbe[r] something like a thousand [and] who hold doctorate and masters degrees in all areas of science," are affiliated with either or both the Institute for Creation Research and the Creation Research Society. *Id.*, at E–503—E–504. Information on both of these organizations is part of the legislative history,

and a review of their goals and activities sheds light on the nature of creation science as it was presented to, and understood by, the Louisiana Legislature.

The Institute for Creation Research is an affiliate of the Christian Heritage College in San Diego, California. The Institute was established to address the "urgent need for our nation to return to belief in a personal, omnipotent Creator, who has a purpose for His creation and to whom all people must eventually give account." 1 *id.*, at E–197. A goal of the Institute is "a revival of belief in special creation as the true explanation of the origin of the world." Therefore, the Institute currently is working on the "development of new methods for teaching scientific creationism in public schools." *Id.*, at E–197—E–199. The Creation Research Society (CRS) is located in Ann Arbor, Michigan. A member must subscribe to the following statement of belief: "The Bible is the written word of God, and because it is inspired throughout, all of its assertions are historically and scientifically true." 2 *id.*, at E–583. To study creation science at the CRS, a member must accept "that the account of origins in Genesis is a factual presentation of simple historical truth." *Ibid.*[3]

---

[3] The District Court in *McLean* noted three other elements of the CRS statement of belief to which members must subscribe:

" '[i] All basic types of living things, including man, were made by direct creative acts of God during Creation Week as described in Genesis. Whatever biological changes have occurred since Creation have accomplished only changes within the original created kinds. [ii] The great Flood described in Genesis, commonly referred to as the Noachian Deluge, was an historical event, world-wide in its extent and effect. [iii] Finally, we are an organization of Christian men of science, who accept Jesus Christ as our Lord and Savior. The account of the special creation of Adam and Eve as one man and one woman, and their subsequent Fall into sin, is the basis for our belief in the necessity of a Savior for all mankind. Therefore, salvation can come only thru (sic) accepting Jesus Christ as our Savior.' " 529 F. Supp., at 1260, n. 7.

## C

When, as here, "both courts below are unable to discern an arguably valid secular purpose, this Court normally should hesitate to find one." *Wallace* v. *Jaffree*, 472 U. S., at 66 (POWELL, J., concurring). My examination of the language and the legislative history of the Balanced Treatment Act confirms that the intent of the Louisiana Legislature was to promote a particular religious belief. The legislative history of the Arkansas statute prohibiting the teaching of evolution examined in *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), was strikingly similar to the legislative history of the Balanced Treatment Act. In *Epperson*, the Court found:

> "It is clear that fundamentalist sectarian conviction was and is the law's reason for existence. Its antecedent, Tennessee's 'monkey law,' candidly stated its purpose: to make it unlawful 'to teach any theory that denies the story of the Divine Creation of man as taught in the Bible, and to teach instead that man has descended from a lower order of animals.' Perhaps the sensational publicity attendant upon the *Scopes* trial induced Arkansas to adopt less explicit language. It eliminated Tennessee's reference to 'the story of the Divine creation of man' as taught in the Bible, but there is no doubt that the motivation for the law was the same: to suppress the teaching of a theory which, it was thought, 'denied' the divine creation of man." *Id.*, at 107–109 (footnotes omitted).

Here, it is clear that religious belief is the Balanced Treatment Act's "reason for existence." The tenets of creation science parallel the Genesis story of creation,[4] and this is a

---

[4] After hearing testimony from numerous experts, the District Court in *McLean* concluded that "[t]he parallels between [the definition section of the model Act] and Genesis are quite specific." *Id.*, at 1265, n. 19. It found the concepts of "sudden creation from nothing," a worldwide flood of divine origin, and "kinds" to be derived from Genesis; "relatively recent inception" to mean "an age of the earth from 6,000 to 10,000 years" and to

religious belief. "[N]o legislative recitation of a supposed secular purpose can blind us to that fact." *Stone* v. *Graham*, 449 U. S. 39, 41 (1980). Although the Act as finally enacted does not contain explicit reference to its religious purpose, there is no indication in the legislative history that the deletion of "creation ex nihilo" and the four primary tenets of the theory was intended to alter the purpose of teaching creation science. Instead, the statements of purpose of the sources of creation science in the United States make clear that their purpose is to promote a religious belief. I find no persuasive evidence in the legislative history that the legislature's purpose was any different. The fact that the Louisiana Legislature purported to add information to the school curriculum rather than detract from it as in *Epperson* does not affect my analysis. Both legislatures acted with the unconstitutional purpose of structuring the public school curriculum to make it compatible with a particular religious belief: the "divine creation of man."

That the statute is limited to the scientific evidences supporting the theory does not render its purpose secular. In reaching its conclusion that the Act is unconstitutional, the Court of Appeals "[did] not deny that the underpinnings of creationism may be supported by scientific evidence." 765 F. 2d 1251, 1256 (1985). And there is no need to do so. Whatever the academic merit of particular subjects or theories, the Establishment Clause limits the discretion of state officials to pick and choose among them for the purpose of promoting a particular religious belief. The language of the statute and its legislative history convince me that the Louisiana Legislature exercised its discretion for this purpose in this case.

---

be based "on the genealogy of the Old Testament using the rather astronomical ages assigned to the patriarchs"; and the "separate ancestry of man and ape" to focus on "the portion of the theory of evolution which Fundamentalists find most offensive." *Ibid.* (citing *Epperson* v. *Arkansas*, 393 U. S. 97 (1968)).

## II

Even though I find Louisiana's Balanced Treatment Act unconstitutional, I adhere to the view "that the States and locally elected school boards should have the responsibility for determining the educational policy of the public schools." *Board of Education, Island Trees Union Free School Dist. No. 26* v. *Pico*, 457 U. S. 853, 893 (1982) (POWELL, J., dissenting). A decision respecting the subject matter to be taught in public schools does not violate the Establishment Clause simply because the material to be taught "'happens to coincide or harmonize with the tenets of some or all religions.'" *Harris* v. *McRae*, 448 U. S. 297, 319 (1980) (quoting *McGowan* v. *Maryland*, 366 U. S. 420, 442 (1961)). In the context of a challenge under the Establishment Clause, interference with the decisions of these authorities is warranted only when the purpose for their decisions is clearly religious.

The history of the Religion Clauses of the First Amendment has been chronicled by this Court in detail. See, *e. g.*, *Everson* v. *Board of Education*, 330 U. S. 1, 8–14 (1947); *Engel* v. *Vitale*, 370 U. S. 421, 425–430 (1962); *McGowan* v. *Maryland, supra*, at 437–442. Therefore, only a brief review at this point may be appropriate. The early settlers came to this country from Europe to escape religious persecution that took the form of forced support of state-established churches. The new Americans thus reacted strongly when they perceived the same type of religious intolerance emerging in this country. The reaction in Virginia, the home of many of the Founding Fathers, is instructive. George Mason's draft of the Virginia Declaration of Rights was adopted by the House of Burgesses in 1776. Because of James Madison's influence, the Declaration of Rights embodied the guarantee of *free exercise* of religion, as opposed to *toleration*. Eight years later, a provision prohibiting the establishment of religion became a part of Virginia law when James Madison's Memorial and Remonstrance against Re-

ligious Assessments, written in response to a proposal that all Virginia citizens be taxed to support the teaching of the Christian religion, spurred the legislature to consider and adopt Thomas Jefferson's Bill for Establishing Religious Freedom. See *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 770, n. 28. Both the guarantees of free exercise and against the establishment of religion were then incorporated into the Federal Bill of Rights by its drafter, James Madison.

While the "meaning and scope of the First Amendment" must be read "in light of its history and the evils it was designed forever to suppress," *Everson* v. *Board of Education, supra,* at 14–15, this Court has also recognized that "this Nation's history has not been one of entirely sanitized separation between Church and State." *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 760. "The fact that the Founding Fathers believed devotedly that there was a God and that the unalienable rights of man were rooted in Him is clearly evidenced in their writings, from the Mayflower Compact to the Constitution itself." *Abington School District* v. *Schempp,* 374 U. S. 203, 213 (1963).[5] The Court properly has noted "an unbroken history of official acknowledgment . . . of the role of religion in American life." *Lynch* v. *Donnelly,* 465 U. S., at 674, and has recognized that these references to "our religious heritage" are constitutionally acceptable. *Id.,* at 677.

As a matter of history, schoolchildren can and should properly be informed of all aspects of this Nation's religious heritage. I would see no constitutional problem if schoolchildren were taught the nature of the Founding Father's religious beliefs and how these beliefs affected the attitudes

---

[5] John Adams wrote to Thomas Jefferson: "[T]he Bible is the best book in the world. It contains more of my little philosophy than all the libraries I have seen; and such parts of it as I cannot reconcile to my little philosophy, I postpone for future investigation." Letter of Dec. 25, 1813, 10 Works of John Adams 85 (1856).

of the times and the structure of our government.[6] Courses in comparative religion of course are customary and constitutionally appropriate.[7] In fact, since religion permeates our history, a familiarity with the nature of religious beliefs is necessary to understand many historical as well as contemporary events.[8] In addition, it is worth noting that the Estab-

---

[6] There is an enormous variety of religions in the United States. The Encyclopedia of American Religions (2d ed. 1987) describes 1,347 religious organizations. The United States Census Bureau groups the major American religions into: Buddhist Churches of America; Eastern Churches; Jews; Old Catholic, Polish National Catholic, and Armenian Churches; The Roman Catholic Church; Protestants; and Miscellaneous. Statistical Abstract of the United States 50 (106th ed. 1986).

Our country has become strikingly multireligious as well as multiracial and multiethnic. This fact, perhaps more than anything one could write, demonstrates the wisdom of including the Establishment Clause in the First Amendment. States' proposals for what became the Establishment Clause evidence the goal of accommodating competing religious beliefs. See, e. g., New York's Resolution·of Ratification reprinted in 2 Documentary History of the Constitution 190, 191 (1894) ("[N]o Religious Sect or Society ought to be favoured or established by Law in preference of others").

[7] State-sponsored universities in Louisiana already offer courses integrating religious studies into the curriculum. Approximately half of the state-sponsored universities offer one or more courses involving religion. As an example, Louisiana State University at Baton Rouge offers seven courses: Introduction to Religion, Old Testament, New Testament, Faith and Doubt, Jesus in History and Tradition, Eastern Religions, and Philosophy of Religion.

Of course, the difference in maturity between college-age and secondary students may affect the constitutional analysis of a particular public school policy. See Widmar v. Vincent, 454 U. S. 263, 274, n. 14 (1981). Nevertheless, many general teaching guides suggest that education as to the nature of various religious beliefs could be integrated into a secondary school curriculum in a manner consistent with the Constitution. See, e. g., C. Kniker, Teaching about Religion in Public Schools (1985); Religion in Elementary Social Studies Project, Final Report (Fla. State Univ. 1976); L. Karp, Teaching the Bible as Literature in Public Schools (1973).

[8] For example, the political controversies in Northern Ireland, the Middle East, and India cannot be understood properly without reference to the underlying religious beliefs and the conflicts they tend to generate.

lishment Clause does not prohibit *per se* the educational use of religious documents in public school education. Although this Court has recognized that the Bible is "an instrument of religion," *Abington School District* v. *Schempp, supra,* at 224, it also has made clear that the Bible "may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, or the like." *Stone* v. *Graham,* 449 U. S., at 42 (citing *Abington School District* v. *Schempp, supra,* at 225). The book is, in fact, "the world's all-time best seller"[9] with undoubted literary and historic value apart from its religious content. The Establishment Clause is properly understood to prohibit the use of the Bible and other religious documents in public school education only when the purpose of the use is to advance a particular religious belief.

## III

In sum, I find that the language and the legislative history of the Balanced Treatment Act unquestionably demonstrate that its purpose is to advance a particular religious belief. Although the discretion of state and local authorities over public school curricula is broad, "the First Amendment does not permit the State to require that teaching and learning must be tailored to the principles or prohibitions of any religious sect or dogma." *Epperson* v. *Arkansas,* 393 U. S., at 106. Accordingly, I concur in the opinion of the Court and its judgment that the Balanced Treatment Act violates the Establishment Clause of the Constitution.

JUSTICE WHITE, concurring in the judgment.

As it comes to us, this is not a difficult case. Based on the historical setting and plain language of the Act both courts construed the statutory words "creation science" to refer to a religious belief, which the Act required to be taught if evolu-

---

[9] See N. Y. Times, May 10, 1981, section 2, p. 24, col. 3; N. McWhirter, 1986 Guiness Book of World Records 144 (the Bible is the world's most widely distributed book).

tion was taught. In other words, the teaching of evolution was conditioned on the teaching of a religious belief. Both courts concluded that the state legislature's primary purpose was to advance religion and that the statute was therefore unconstitutional under the Establishment Clause.

We usually defer to courts of appeals on the meaning of a state statute, especially when a district court has the same view. Of course, we have the power to disagree, and the lower courts in a particular case may be plainly wrong. But if the meaning ascribed to a state statute by a court of appeals is a rational construction of the statute, we normally accept it. *Brockett* v. *Spokane Arcades, Inc.*, 472 U. S. 491, 499–500 (1985); *Chardon* v. *Fumero Soto*, 462 U. S. 650, 654–655, n. 5 (1983); *Haring* v. *Prosise*, 462 U. S. 306, 314, n. 8 (1983); *Pierson* v. *Ray*, 386 U. S. 547, 558, n. 12 (1967); *General Box Co.* v. *United States*, 351 U. S. 159, 165 (1956). We do so because we believe "that district courts and courts of appeals are better schooled in and more able to interpret the laws of their respective States." *Brockett* v. *Spokane Arcades, supra,* at 500. *Brockett* also indicates that the usual rule applies in First Amendment cases.

Here, the District Judge, relying on the terms of the Act, discerned its purpose to be the furtherance of a religious belief, and a panel of the Court of Appeals agreed. Of those four judges, two are Louisianians. I would accept this view of the statute. Even if as an original matter I might have arrived at a different conclusion based on a reading of the statute and the record before us, I cannot say that the two courts below are so plainly wrong that they should be reversed. Rehearing en banc was denied by an 8–7 vote, the dissenters expressing their disagreement with the panel decision. The disagreement, however, was over the construction of the Louisiana statute, particularly the assessment of its purpose, and offers no justification for departing from the usual rule counseling against *de novo* constructions of state statutes.

If the Court of Appeals' construction is to be accepted, so is its conclusion that under our prior cases the Balanced Treatment Act is unconstitutional because its primary purpose is to further a religious belief by imposing certain requirements on the school curriculum. Unless, therefore, we are to reconsider the Court's decisions interpreting the Establishment Clause, I agree that the judgment of the Court of Appeals must be affirmed.

JUSTICE SCALIA, with whom THE CHIEF JUSTICE joins, dissenting.

Even if I agreed with the questionable premise that legislation can be invalidated under the Establishment Clause on the basis of its motivation alone, without regard to its effects, I would still find no justification for today's decision. The Louisiana legislators who passed the "Balanced Treatment for Creation-Science and Evolution-Science Act" (Balanced Treatment Act), La. Rev. Stat. Ann. §§ 17:286.1–17:286.7 (West 1982), each of whom had sworn to support the Constitution,[1] were well aware of the potential Establishment Clause problems and considered that aspect of the legislation with great care. After seven hearings and several months of study, resulting in substantial revision of the original proposal, they approved the Act overwhelmingly and specifically articulated the secular purpose they meant it to serve. Although the record contains abundant evidence of the sincerity of that purpose (the only issue pertinent to this case), the Court today holds, essentially on the basis of "its visceral knowledge regarding what *must* have motivated the legislators," 778 F. 2d 225, 227 (CA5 1985) (Gee, J., dissenting) (emphasis added), that the members of the Louisiana Legislature knowingly violated their oaths and then lied about it. I dissent. Had requirements of the Balanced Treatment Act that

---

[1] Article VI, cl. 3, of the Constitution provides that "the Members of the several State Legislatures . . . shall be bound by Oath or Affirmation, to support this Constitution."

are not apparent on its face been clarified by an interpretation of the Louisiana Supreme Court, or by the manner of its implementation, the Act might well be found unconstitutional; but the question of its constitutionality cannot rightly be disposed of on the gallop, by impugning the motives of its supporters.

I

This case arrives here in the following posture: The Louisiana Supreme Court has never been given an opportunity to interpret the Balanced Treatment Act, State officials have never attempted to implement it, and it has never been the subject of a full evidentiary hearing. We can only guess at its meaning. We know that it forbids instruction in either "creation-science" or "evolution-science" without instruction in the other, § 17:286.4A, but the parties are sharply divided over what creation science consists of. Appellants insist that it is a collection of educationally valuable scientific data that has been censored from classrooms by an embarrassed scientific establishment. Appellees insist it is not science at all but thinly veiled religious doctrine. Both interpretations of the intended meaning of that phrase find considerable support in the legislative history.

At least at this stage in the litigation, it is plain to me that we must accept appellants' view of what the statute means. To begin with, the statute itself *defines* "creation-science" as "the *scientific evidences* for creation and inferences from those *scientific evidences*." § 17:286.3(2) (emphasis added). If, however, that definition is not thought sufficiently helpful, the means by which the Louisiana Supreme Court will give the term more precise content is quite clear—and again, at this stage in the litigation, favors the appellants' view. "Creation science" is unquestionably a "term of art," see Brief for 72 Nobel Laureates et al. as *Amici Curiae* 20, and thus, under Louisiana law, is "to be interpreted according to [its] received meaning and acceptation with the learned in the art, trade or profession to which [it] refer[s]." La. Civ.

Code Ann., Art. 15 (West 1952).[2] The only evidence in the record of the "received meaning and acceptation" of "creation science" is found in five affidavits filed by appellants. In those affidavits, two scientists, a philosopher, a theologian, and an educator, all of whom claim extensive knowledge of creation science, swear that it is essentially a collection of scientific data supporting the theory that the physical universe and life within it appeared suddenly and have not changed substantially since appearing. See App. to Juris. Statement A–19 (Kenyon); id., at A–36 (Morrow); id., at A–41 (Miethe). These experts insist that creation science is a strictly scientific concept that can be presented without religious reference. See id., at A–19—A–20, A–35 (Kenyon); id., at A–36—A–38 (Morrow); id., at A–40, A–41, A–43 (Miethe); id., at A–47, A–48 (Most); id., at A–49 (Clinkert). At this point, then, we must assume that the Balanced Treatment Act does not require the presentation of religious doctrine.

Nothing in today's opinion is plainly to the contrary, but what the statute means and what it requires are of rather little concern to the Court. Like the Court of Appeals, 765 F. 2d 1251, 1253, 1254 (CA5 1985), the Court finds it necessary to consider only the motives of the legislators who supported the Balanced Treatment Act, ante, at 586, 593–594, 596. After examining the statute, its legislative history, and its historical and social context, the Court holds that the Louisiana Legislature acted without "a secular legislative purpose" and that the Act therefore fails the "purpose" prong of the three-part test set forth in Lemon v. Kurtzman, 403 U. S. 602, 612 (1971). As I explain below, infra, at 636–640,

---

[2] Thus the popular dictionary definitions cited by JUSTICE POWELL, ante, at 598–599 (concurring opinion), and appellees, see Brief for Appellees 25, 26; Tr. of Oral Arg. 32, 34, are utterly irrelevant, as are the views of the school superintendents cited by the majority, ante, at 595, n. 18. Three-quarters of those surveyed had "[n]o" or "[l]imited" knowledge of "creation-science theory," and not a single superintendent claimed "[e]xtensive" knowledge of the subject. 2 App. E–798.

I doubt whether that "purpose" requirement of *Lemon* is a proper interpretation of the Constitution; but even if it were, I could not agree with the Court's assessment that the requirement was not satisfied here.

This Court has said little about the first component of the *Lemon* test. Almost invariably, we have effortlessly discovered a secular purpose for measures challenged under the Establishment Clause, typically devoting no more than a sentence or two to the matter. See, *e. g.*, *Witters* v. *Washington Dept. of Services for Blind*, 474 U. S. 481, 485–486 (1986); *Grand Rapids School District* v. *Ball*, 473 U. S. 373, 383 (1985); *Mueller* v. *Allen*, 463 U. S. 388, 394–395 (1983); *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116, 123–124 (1982); *Widmar* v. *Vincent*, 454 U. S. 263, 271 (1981); *Committee for Public Education & Religious Liberty* v. *Regan*, 444 U. S. 646, 654, 657 (1980); *Wolman* v. *Walter*, 433 U. S. 229, 236 (1977) (plurality opinion); *Meek* v. *Pittenger*, 421 U. S. 349, 363 (1975); *Committee for Public Education & Religious Liberty* v. *Nyquist*, 413 U. S. 756, 773 (1973); *Levitt* v. *Committee for Public Education & Religious Liberty*, 413 U. S. 472, 479–480, n. 7 (1973); *Tilton* v. *Richardson*, 403 U. S. 672, 678–679 (1971) (plurality opinion); *Lemon* v. *Kurtzman*, *supra*, at 613. In fact, only once before deciding *Lemon*, and twice since, have we invalidated a law for lack of a secular purpose. See *Wallace* v. *Jaffree*, 472 U. S. 38 (1985); *Stone* v. *Graham*, 449 U. S. 39 (1980) *(per curiam); Epperson* v. *Arkansas*, 393 U. S. 97 (1968).

Nevertheless, a few principles have emerged from our cases, principles which should, but to an unfortunately large extent do not, guide the Court's application of *Lemon* today. It is clear, first of all, that regardless of what "legislative purpose" may mean in other contexts, for the purpose of the *Lemon* test it means the "actual" motives of those responsible for the challenged action. The Court recognizes this, see *ante*, at 585, as it has in the past, see, *e. g.*, *Witters* v. *Washington Dept. of Services for Blind*, *supra*, at 486; *Wallace* v.

*Jaffree, supra,* at 56. Thus, if those legislators who supported the Balanced Treatment Act *in fact* acted with a "sincere" secular purpose, *ante,* at 587, the Act survives the first component of the *Lemon* test, regardless of whether that purpose is likely to be achieved by the provisions they enacted.

Our cases have also confirmed that when the *Lemon* Court referred to "a secular . . . purpose," 403 U. S., at 612, it meant "*a* secular purpose." The author of *Lemon,* writing for the Court, has said that invalidation under the purpose prong is appropriate when "there [is] *no question* that the statute or activity was motivated *wholly* by religious considerations." *Lynch* v. *Donnelly,* 465 U. S. 668, 680 (1984) (Burger, C. J.) (emphasis added); see also *id.,* at 681, n. 6; *Wallace* v. *Jaffree, supra,* at 56 ("[T]he First Amendment requires that a statute must be invalidated if it is *entirely* motivated by a purpose to advance religion") (emphasis added; footnote omitted). In all three cases in which we struck down laws under the Establishment Clause for lack of a secular purpose, we found that the legislature's sole motive was to promote religion. See *Wallace* v. *Jaffree, supra,* at 56, 57, 60; *Stone* v. *Graham, supra,* at 41, 43, n. 5; *Epperson* v. *Arkansas, supra,* at 103, 107–108; see also *Lynch* v. *Donnelly, supra,* at 680 (describing *Stone* and *Epperson* as cases in which we invalidated laws "motivated wholly by religious considerations"). Thus, the majority's invalidation of the Balanced Treatment Act is defensible only if the record indicates that the Louisiana Legislature had *no* secular purpose.

It is important to stress that the purpose forbidden by *Lemon* is the purpose to "advance religion." 403 U. S., at 613; accord, *ante,* at 585 ("promote" religion); *Witters* v. *Washington Dept. of Services for Blind, supra,* at 486 ("endorse religion"); *Wallace* v. *Jaffree,* 472 U. S., at 56 ("advance religion"); *ibid.* ("endorse . . . religion"); *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 788 ("'advancing' . . . religion"); *Levitt* v. *Committee for*

*Public Education & Religious Liberty, supra,* at 481 ("advancing religion"); *Walz* v. *Tax Comm'n of New York City,* 397 U. S. 664, 674 (1970) ("establishing, sponsoring, or supporting religion"); *Board of Education* v. *Allen,* 392 U. S. 236, 243 (1968) ("'advancement or inhibition of religion'") (quoting *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 222 (1963)). Our cases in no way imply that the Establishment Clause forbids legislators merely to act upon their religious convictions. We surely would not strike down a law providing money to feed the hungry or shelter the homeless if it could be demonstrated that, but for the religious beliefs of the legislators, the funds would not have been approved. Also, political activism by the religiously motivated is part of our heritage. Notwithstanding the majority's implication to the contrary, *ante,* at 589–591, we do not presume that the sole purpose of a law is to advance religion merely because it was supported strongly by organized religions or by adherents of particular faiths. See *Walz* v. *Tax Comm'n of New York City, supra,* at 670; cf. *Harris* v. *McRae,* 448 U. S. 297, 319–320 (1980). To do so would deprive religious men and women of their right to participate in the political process. Today's religious activism may give us the Balanced Treatment Act, but yesterday's resulted in the abolition of slavery, and tomorrow's may bring relief for famine victims.

Similarly, we will not presume that a law's purpose is to advance religion merely because it "'happens to coincide or harmonize with the tenets of some or all religions,'" *Harris* v. *McRae, supra,* at 319 (quoting *McGowan* v. *Maryland,* 366 U. S. 420, 442 (1961)), or because it benefits religion, even substantially. We have, for example, turned back Establishment Clause challenges to restrictions on abortion funding, *Harris* v. *McRae, supra,* and to Sunday closing laws, *McGowan* v. *Maryland, supra,* despite the fact that both "agre[e] with the dictates of [some] Judaeo-Christian religions," *id.,* at 442. "In many instances, the Congress or state legislatures conclude that the general welfare of soci-

ety, wholly apart from any religious considerations, demands such regulation." *Ibid.* On many past occasions we have had no difficulty finding a secular purpose for governmental action far more likely to advance religion than the Balanced Treatment Act. See, *e. g., Mueller* v. *Allen,* 463 U. S., at 394–395 (tax deduction for expenses of religious education); *Wolman* v. *Walter,* 433 U. S., at 236 (plurality opinion) (aid to religious schools); *Meek* v. *Pittenger,* 421 U. S., at 363 (same); *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 773 (same); *Lemon* v. *Kurtzman,* 403 U. S., at 613 (same); *Walz* v. *Tax Comm'n of New York City, supra,* at 672 (tax exemption for church property); *Board of Education* v. *Allen, supra,* at 243 (textbook loans to students in religious schools). Thus, the fact that creation science coincides with the beliefs of certain religions, a fact upon which the majority relies heavily, does not itself justify invalidation of the Act.

Finally, our cases indicate that even certain kinds of governmental actions undertaken with the specific intention of improving the position of religion do not "advance religion" as that term is used in *Lemon.* 403 U. S., at 613. Rather, we have said that in at least two circumstances government *must* act to advance religion, and that in a third it *may* do so.

First, since we have consistently described the Establishment Clause as forbidding not only state action motivated by the desire to *advance* religion, but also that intended to "disapprove," "inhibit," or evince "hostility" toward religion, see, *e. g., ante,* at 585 ("'disapprove'") (quoting *Lynch* v. *Donnelly, supra,* at 690 (O'CONNOR, J., concurring)); *Lynch* v. *Donnelly, supra,* at 673 ("hostility"); *Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 788 ("'inhibi[t]'"); and since we have said that governmental "neutrality" toward religion is the preeminent goal of the First Amendment, see, *e. g., Grand Rapids School District* v. *Ball,* 473 U. S., at 382; *Roemer* v. *Maryland Public Works Bd.,* 426 U. S. 736, 747 (1976) (plurality opinion);

*Committee for Public Education & Religious Liberty* v. *Nyquist, supra,* at 792–793; a State which discovers that its employees are inhibiting religion must take steps to prevent them from doing so, even though its purpose would clearly be to advance religion. Cf. *Walz* v. *Tax Comm'n of New York City, supra,* at 673. Thus, if the Louisiana Legislature sincerely believed that the State's science teachers were being hostile to religion, our cases indicate that it could act to eliminate that hostility without running afoul of *Lemon*'s purpose test.

Second, we have held that intentional governmental advancement of religion is sometimes required by the Free Exercise Clause. For example, in *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* 480 U. S. 136 (1987); *Thomas* v. *Review Bd., Indiana Employment Security Div.,* 450 U. S. 707 (1981); *Wisconsin* v. *Yoder,* 406 U. S. 205 (1972); and *Sherbert* v. *Verner,* 374 U. S. 398 (1963), we held that in some circumstances States must accommodate the beliefs of religious citizens by exempting them from generally applicable regulations. We have not yet come close to reconciling *Lemon* and our Free Exercise cases, and typically we do not really try. See, *e. g., Hobbie* v. *Unemployment Appeals Comm'n of Fla., supra,* at 144–145; *Thomas* v. *Review Bd., Indiana Employment Security Div., supra,* at 719–720. It is clear, however, that members of the Louisiana Legislature were not impermissibly motivated for purposes of the *Lemon* test if they believed that approval of the Balanced Treatment Act was *required* by the Free Exercise Clause.

We have also held that in some circumstances government may act to accommodate religion, even if that action is not required by the First Amendment. See *Hobbie* v. *Unemployment Appeals Comm'n of Fla., supra,* at 144–145. It is well established that "[t]he limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause." *Walz* v. *Tax Comm'n of New York City, supra,* at 673;

see also *Gillette* v. *United States,* 401 U. S. 437, 453 (1971). We have implied that voluntary governmental accommodation of religion is not only permissible, but desirable. See, *e. g., ibid.* Thus, few would contend that Title VII of the Civil Rights Act of 1964, which both forbids religious discrimination by private-sector employers, 78 Stat. 255, 42 U. S. C. § 2000e–2(a)(1), and requires them reasonably to accommodate the religious practices of their employees, § 2000e(j), violates the Establishment Clause, even though its "purpose" is, of course, to advance religion, and even though it is almost certainly not required by the Free Exercise Clause. While we have warned that at some point, accommodation may devolve into "an unlawful fostering of religion," *Hobbie* v. *Unemployment Appeals Comm'n of Fla.,* *supra,* at 145, we have not suggested precisely (or even roughly) where that point might be. It is possible, then, that even if the sole motive of those voting for the Balanced Treatment Act was to advance religion, and its passage was not actually required, or even believed to be required, by either the Free Exercise or Establishment Clauses, the Act would nonetheless survive scrutiny under *Lemon*'s purpose test.

One final observation about the application of that test: Although the Court's opinion gives no hint of it, in the past we have repeatedly affirmed "our reluctance to attribute unconstitutional motives to the States." *Mueller* v. *Allen, supra,* at 394; see also *Lynch* v. *Donnelly,* 465 U. S., at 699 (BRENNAN, J., dissenting). We "presume that legislatures act in a constitutional manner." *Illinois* v. *Krull,* 480 U. S. 340, 351 (1987); see also *Clements* v. *Fashing,* 457 U. S. 957, 963 (1982) (plurality opinion); *Rostker* v. *Goldberg,* 453 U. S. 57, 64 (1981); *McDonald* v. *Board of Election Comm'rs of Chicago,* 394 U. S. 802, 809 (1969). Whenever we are called upon to judge the constitutionality of an act of a state legislature, "we must have 'due regard to the fact that this Court is not exercising a primary judgment but is sitting in judgment

upon those who also have taken the oath to observe the Constitution and who have the responsibility for carrying on government.'" *Rostker* v. *Goldberg, supra,* at 64 (quoting *Joint Anti-Fascist Refugee Committee* v. *McGrath,* 341 U. S. 123, 164 (1951) (Frankfurter, J., concurring)). This is particularly true, we have said, where the legislature has specifically considered the question of a law's constitutionality. *Ibid.*

With the foregoing in mind, I now turn to the purposes underlying adoption of the Balanced Treatment Act.

## II

### A

We have relatively little information upon which to judge the motives of those who supported the Act. About the only direct evidence is the statute itself and transcripts of the seven committee hearings at which it was considered. Unfortunately, several of those hearings were sparsely attended, and the legislators who were present revealed little about their motives. We have no committee reports, no floor debates, no remarks inserted into the legislative history, no statement from the Governor, and no postenactment statements or testimony from the bill's sponsor or any other legislators. Cf. *Wallace* v. *Jaffree,* 472 U. S., at 43, 56–57. Nevertheless, there is ample evidence that the majority is wrong in holding that the Balanced Treatment Act is without secular purpose.

At the outset, it is important to note that the Balanced Treatment Act did not fly through the Louisiana Legislature on wings of fundamentalist religious fervor—which would be unlikely, in any event, since only a small minority of the State's citizens belong to fundamentalist religious denominations. See B. Quinn, H. Anderson, M. Bradley, P. Goetting, & P. Shriver, Churches and Church Membership in the United States 16 (1982). The Act had its genesis (so to speak) in legislation introduced by Senator Bill Keith in June

1980. After two hearings before the Senate Committee on Education, Senator Keith asked that his bill be referred to a study commission composed of members of both Houses of the Louisiana Legislature. He expressed hope that the joint committee would give the bill careful consideration and determine whether his arguments were "legitimate." 1 App. E–29—E–30. The committee met twice during the interim, heard testimony (both for and against the bill) from several witnesses, and received staff reports. Senator Keith introduced his bill again when the legislature reconvened. The Senate Committee on Education held two more hearings and approved the bill after substantially amending it (in part over Senator Keith's objection). After approval by the full Senate, the bill was referred to the House Committee on Education. That committee conducted a lengthy hearing, adopted further amendments, and sent the bill on to the full House, where it received favorable consideration. The Senate concurred in the House amendments and on July 20, 1981, the Governor signed the bill into law.

Senator Keith's statements before the various committees that considered the bill hardly reflect the confidence of a man preaching to the converted. He asked his colleagues to "keep an open mind" and not to be "biased" by misleading characterizations of creation science. *Id.*, at E–33. He also urged them to "look at this subject on its merits and not on some preconceived idea." *Id.*, at E–34; see also 2 *id.*, at E–491. Senator Keith's reception was not especially warm. Over his strenuous objection, the Senate Committee on Education voted 5–1 to amend his bill to deprive it of any force; as amended, the bill merely gave teachers *permission* to balance the teaching of creation science or evolution with the other. 1 *id.*, at E–442—E–461. The House Committee restored the "mandatory" language to the bill by a vote of only 6–5, 2 *id.*, at E–626—E–627, and both the full House (by vote of 52–35), *id.*, at E–700—E–706, and full Senate (23–15), *id.*, at E–735—E–738, had to repel further efforts to gut the bill.

The legislators understood that Senator Keith's bill involved a "unique" subject, 1 *id.*, at E–106 (Rep. M. Thompson), and they were repeatedly made aware of its potential constitutional problems, see, *e. g.*, *id.*, at E–26—E–28 (McGehee); *id.*, at E–38—E–39 (Sen. Keith); *id.*, at E–241—E–242 (Rossman); *id.*, at E–257 (Probst); *id.*, at E–261 (Beck); *id.*, at E–282 (Sen. Keith). Although the Establishment Clause, including its secular purpose requirement, was of substantial concern to the legislators, they eventually voted overwhelmingly in favor of the Balanced Treatment Act: The House approved it 71–19 (with 15 members absent), 2 *id.*, at E–716—E–722; the Senate 26–12 (with all members present), *id.*, at E–741—E–744. The legislators specifically designated the protection of "academic freedom" as the purpose of the Act. La. Rev. Stat. Ann. § 17:286.2 (West 1982). We cannot accurately assess whether this purpose is a "sham," *ante*, at 587, until we first examine the evidence presented to the legislature far more carefully than the Court has done.

Before summarizing the testimony of Senator Keith and his supporters, I wish to make clear that I by no means intend to endorse its accuracy. But my views (and the views of this Court) about creation science and evolution are (or should be) beside the point. Our task is not to judge the debate about teaching the origins of life, but to ascertain what the members of the Louisiana Legislature believed. The vast majority of them voted to approve a bill which explicitly stated a secular purpose; what is crucial is not their *wisdom* in believing that purpose would be achieved by the bill, but their *sincerity* in believing it would be.

Most of the testimony in support of Senator Keith's bill came from the Senator himself and from scientists and educators he presented, many of whom enjoyed academic credentials that may have been regarded as quite impressive by members of the Louisiana Legislature. To a substantial extent, their testimony was devoted to lengthy, and, to the layman, seemingly expert scientific expositions on the origin

of life. See, *e. g.*, 1 App. E–11—E–18 (Sunderland); *id.*, at E–50—E–60 (Boudreaux); *id.*, at E–86—E–89 (Ward); *id.*, at E–130—E–153 (Boudreaux paper); *id.*, at E–321—E–326 (Boudreaux); *id.*, at E–423—E–428 (Sen. Keith). These scientific lectures touched upon, *inter alia*, biology, paleontology, genetics, astronomy, astrophysics, probability analysis, and biochemistry. The witnesses repeatedly assured committee members that "hundreds and hundreds" of highly respected, internationally renowned scientists believed in creation science and would support their testimony. See, *e. g.*, *id.*, at E–5 (Sunderland); *id.*, at E–76 (Sen. Keith); *id.*, at E–100—E–101 (Reiboldt); *id.*, at E–327—E–328 (Boudreaux); 2 *id.*, at E–503—E–504 (Boudreaux).

Senator Keith and his witnesses testified essentially as set forth in the following numbered paragraphs:

(1) There are two and only two scientific explanations for the beginning of life [3]—evolution and creation science. 1 *id.*, at E–6 (Sunderland); *id.*, at E–34 (Sen. Keith); *id.*, at E–280 (Sen. Keith); *id.*, at E–417—E–418 (Sen. Keith). Both are bona fide "sciences." *Id.*, at E–6—E–7 (Sunderland); *id.*, at E–12 (Sunderland); *id.*, at E–416 (Sen. Keith); *id.*, at E–427 (Sen. Keith); 2 *id.*, at E–491—E–492 (Sen. Keith); *id.*, at E–497—E–498 (Sen. Keith). Both posit a theory of the origin of life and subject that theory to empirical testing. Evolution posits that life arose out of inanimate chemical compounds and has gradually evolved over millions of years. Creation science posits that all life forms now on earth appeared suddenly and relatively recently and have changed little. Since there are only two possible explanations of the origin of life, any evidence that tends to disprove the theory of evolution necessarily tends to prove the theory of creation science, and vice versa. For example, the abrupt appearance in the fossil record of complex life, and the extreme rar-

---

[3] Although creation scientists and evolutionists also disagree about the origin of the physical universe, both proponents and opponents of Senator Keith's bill focused on the question of the beginning of life.

ity of transitional life forms in that record, are evidence for creation science. 1 *id.*, at E–7 (Sunderland); *id.*, at E–12—E–18 (Sunderland); *id.*, at E–45—E–60 (Boudreaux); *id.*, at E–67 (Harlow); *id.*, at E–130—E–153 (Boudreaux paper); *id.*, at E–423—E–428 (Sen. Keith).

(2) The body of scientific evidence supporting creation science is as strong as that supporting evolution. In fact, it may be *stronger. Id.*, at E–214 (Young statement); *id.*, at E–310 (Sen. Keith); *id.*, at E–416 (Sen. Keith); 2 *id.*, at E–492 (Sen. Keith). The evidence for evolution is far less compelling than we have been led to believe. Evolution is not a scientific "fact," since it cannot actually be observed in a laboratory. Rather, evolution is merely a scientific theory or "guess." 1 *id.*, at E–20—E–21 (Morris); *id.*, at E–85 (Ward); *id.*, at E–100 (Reiboldt); *id.*, at E–328—E–329 (Boudreaux); 2 *id.*, at E–506 (Boudreaux). It is a very bad guess at that. The scientific problems with evolution are so serious that it could accurately be termed a "myth." 1 *id.*, at E–85 (Ward); *id.*, at E–92—E–93 (Kalivoda); *id.*, at E–95—E–97 (Sen. Keith); *id.*, at E–154 (Boudreaux paper); *id.,* at E–329 (Boudreaux); *id.*, at E–453 (Sen. Keith); 2 *id.*, at E–505—E–506 (Boudreaux); *id.*, at E–516 (Young).

(3) Creation science is educationally valuable. Students exposed to it better understand the current state of scientific evidence about the origin of life. 1 *id.*, at E–19 (Sunderland); *id.*, at E–39 (Sen. Keith); *id.*, at E–79 (Kalivoda); *id.*, at E–308 (Sen. Keith); 2 *id.*, at E–513—E–514 (Morris). Those students even have a better understanding of evolution. 1 *id.*, at E–19 (Sunderland). Creation science can and should be presented to children without any religious content. *Id.*, at E–12 (Sunderland); *id.*, at E–22 (Sanderford); *id.*, at E–35—E–36 (Sen. Keith); *id.*, at E–101 (Reiboldt); *id.*, at E–279—E–280 (Sen. Keith); *id.*, at E–282 (Sen. Keith).

(4) Although creation science is educationally valuable and strictly scientific, it is now being censored from or misrepresented in the public schools. *Id.*, at E–19 (Sunderland); *id.*,

at E–21 (Morris); *id.*, at E–34 (Sen. Keith); *id.*, at E–37 (Sen. Keith); *id.*, at E–42 (Sen. Keith); *id.*, at E–92 (Kalivoda); *id.*, at E–97—E–98 (Reiboldt); *id.*, at E–214 (Young statement); *id.*, at E–218 (Young statement); *id.*, at E–280 (Sen. Keith); *id.*, at E–309 (Sen. Keith); 2 *id.*, at E–513 (Morris). Evolution, in turn, is misrepresented as an absolute truth. 1 *id.*, at E–63 (Harlow); *id.*, at E–74 (Sen. Keith); *id.*, at E–81 (Kalivoda); *id.*, at E–214 (Young statement); 2 *id.*, at E–507 (Harlow); *id.*, at E–513 (Morris); *id.*, at E–516 (Young). Teachers have been brainwashed by an entrenched scientific establishment composed almost exclusively of scientists to whom evolution is like a "religion." These scientists discriminate against creation scientists so as to prevent evolution's weaknesses from being exposed. 1 *id.*, at E–61 (Boudreaux); *id.*, at E–63—E–64 (Harlow); *id.*, at E–78—E–79 (Kalivoda); *id.*, at E–80 (Kalivoda); *id.*, at E–95—E–97 (Sen. Keith); *id.*, at E–129 (Boudreaux paper); *id.*, at E–218 (Young statement); *id.*, at E–357 (Sen. Keith); *id.*, at E–430 (Boudreaux).

(5) The censorship of creation science has at least two harmful effects. First, it deprives students of knowledge of one of the two scientific explanations for the origin of life and leads them to believe that evolution is proven fact; thus, their education suffers and they are wrongly taught that science has proved their religious beliefs false. Second, it violates the Establishment Clause. The United States Supreme Court has held that secular humanism is a religion. *Id.*, at E–36 (Sen. Keith) (referring to *Torcaso* v. *Watkins*, 367 U. S. 488, 495, n. 11 (1961)); 1 App. E–418 (Sen. Keith); 2 *id.*, at E–499 (Sen. Keith). Belief in evolution is a central tenet of that religion. 1 *id.*, at E–282 (Sen. Keith); *id.*, at E–312— E–313 (Sen. Keith); *id.*, at E–317 (Sen. Keith); *id.*, at E–418 (Sen. Keith); 2 *id.*, at E–499 (Sen. Keith). Thus, by censoring creation science and instructing students that evolution is fact, public school teachers are *now* advancing religion in violation of the Establishment Clause. 1 *id.*, at E–2—E–4

(Sen. Keith); *id.*, at E-36—E-37, E-39 (Sen. Keith); *id.*, at E-154—E-155 (Boudreaux paper); *id.*, at E-281—E-282 (Sen. Keith); *id.*, at E-313 (Sen. Keith); *id.*, at E-315—E-316 (Sen. Keith); *id.*, at E-317 (Sen. Keith); 2 *id.*, at E-499—E-500 (Sen. Keith).

Senator Keith repeatedly and vehemently denied that his purpose was to advance a particular religious doctrine. At the outset of the first hearing on the legislation, he testified: "We are not going to say today that you should have some kind of religious instructions in our schools. . . . We are not talking about religion today. . . . I am not proposing that we take the Bible in each science class and read the first chapter of Genesis." 1 *id.*, at E-35. At a later hearing, Senator Keith stressed: "[T]o . . . teach religion and disguise it as creationism . . . is not my intent. My intent is to see to it that our textbooks are not censored." *Id.*, at E-280. He made many similar statements throughout the hearings. See, *e. g.*, *id.*, at E-41; *id.*, at E-282; *id.*, at E-310; *id.*, at E-417; see also *id.*, at E-44 (Boudreaux); *id.*, at E-80 (Kalivoda).

We have no way of knowing, of course, how many legislators believed the testimony of Senator Keith and his witnesses. But in the absence of evidence to the contrary,[4] we

---

[4] Although appellees and *amici* dismiss the testimony of Senator Keith and his witnesses as pure fantasy, they did not bother to submit evidence of that to the District Court, making it difficult for us to agree with them. The State, by contrast, submitted the affidavits of two scientists, a philosopher, a theologian, and an educator, whose academic credentials are rather impressive. See App. to Juris. Statement A-17—A-18 (Kenyon); *id.*, at A-36 (Morrow); *id.*, at A-39—A-40 (Miethe); *id.*, at A-46—A-47 (Most); *id.*, at A-49 (Clinkert). Like Senator Keith and his witnesses, the affiants swear that evolution and creation science are the only two scientific explanations for the origin of life, see *id.*, at A-19—A-20 (Kenyon); *id.*, at A-38 (Morrow); *id.*, at A-41 (Miethe); that creation science is strictly scientific, see *id.*, at A-18 (Kenyon); *id.*, at A-36 (Morrow); *id.*, at A-40—A-41 (Miethe); *id.*, at A-49 (Clinkert); that creation science is simply a collection of scientific data that supports the hypothesis that life appeared on earth suddenly and has changed little, see *id.*, at A-19 (Kenyon); *id.*, at A-36

have to assume that many of them did. Given that assumption, the Court today plainly errs in holding that the Louisiana Legislature passed the Balanced Treatment Act for exclusively religious purposes.

### B

Even with nothing more than this legislative history to go on, I think it would be extraordinary to invalidate the Balanced Treatment Act for lack of a valid secular purpose. Striking down a law approved by the democratically elected representatives of the people is no minor matter. "The cardinal principle of statutory construction is to save and not to destroy. We have repeatedly held that as between two possible interpretations of a statute, by one of which it would be unconstitutional and by the other valid, our plain duty is to adopt that which will save the act." *NLRB* v. *Jones & Laughlin Steel Corp.*, 301 U. S. 1, 30 (1937). So, too, it seems to me, with discerning statutory purpose. Even if the legislative history were silent or ambiguous about the existence of a secular purpose—and here it is not—the statute should survive *Lemon*'s purpose test. But even more validation than mere legislative history is present here. The Louisiana Legislature explicitly set forth its secular purpose

---

(Morrow); *id.*, at A–41 (Miethe); that hundreds of respected scientists believe in creation science, see *id.*, at A–20 (Kenyon); that evidence for creation science is as strong as evidence for evolution, see *id.*, at A–21 (Kenyon); *id.*, at A–34—A–35 (Kenyon); *id.*, at A–37—A–38 (Morrow); that creation science is educationally valuable, see *id.*, at A–19 (Kenyon); *id.*, at A–36 (Morrow); *id.*, at A–38—A–39 (Morrow); *id.*, at A–49 (Clinkert); that creation science can be presented without religious content, see *id.*, at A–19 (Kenyon); *id.*, at A–35 (Kenyon); *id.*, at A–36 (Morrow); *id.*, at A–40 (Miethe); *id.*, at A–43—A–44 (Miethe); *id.*, at A–47 (Most); *id.*, at A–49 (Clinkert); and that creation science is now censored from classrooms while evolution is misrepresented as proven fact, see *id.*, at A–20 (Kenyon); *id.*, at A–35 (Kenyon); *id.*, at A–39 (Morrow); *id.*, at A–50 (Clinkert). It is difficult to conclude on the basis of these affidavits—the only substantive evidence in the record—that the laymen serving in the Louisiana Legislature must have disbelieved Senator Keith or his witnesses.

("protecting academic freedom") in the very text of the Act. La. Rev. Stat. § 17:286.2 (West 1982). We have in the past repeatedly relied upon or deferred to such expressions, see, *e. g., Committee for Public Education & Religious Liberty* v. *Regan,* 444 U. S., at 654; *Meek* v. *Pittenger,* 421 U. S., at 363, 367–368; *Committee for Public Education & Religious Liberty* v. *Nyquist,* 413 U. S., at 773; *Levitt* v. *Committee for Public Education & Religious Liberty,* 413 U. S., at 479–480, n. 7; *Tilton* v. *Richardson,* 403 U. S., at 678–679 (plurality opinion); *Lemon* v. *Kurtzman,* 403 U. S., at 613; *Board of Education* v. *Allen,* 392 U. S., at 243.

The Court seeks to evade the force of this expression of purpose by stubbornly misinterpreting it, and then finding that the provisions of the Act do not advance that misinterpreted purpose, thereby showing it to be a sham. The Court first surmises that "academic freedom" means "enhancing the freedom of teachers to teach what they will," *ante,* at 586 — even though "academic freedom" in that sense has little scope in the structured elementary and secondary curriculums with which the Act is concerned. Alternatively, the Court suggests that it might mean "maximiz[ing] the comprehensiveness and effectiveness of science instruction," *ante,* at 588 — though that is an exceedingly strange interpretation of the words, and one that is refuted on the very face of the statute. See § 17:286.5. Had the Court devoted to this central question of the meaning of the legislatively expressed purpose a small fraction of the research into legislative history that produced its quotations of religiously motivated statements by individual legislators, it would have discerned quite readily what "academic freedom" meant: *students'* freedom from *indoctrination.* The legislature wanted to ensure that students would be free to decide for themselves how life began, based upon a fair and balanced presentation of the scientific evidence—that is, to protect "the right of each [student] voluntarily to determine what to believe (and what not to believe) free of any coercive pressures from the State." *Grand*

*Rapids School District* v. *Ball,* 473 U. S., at 385. The legislature did not care *whether* the topic of origins was taught; it simply wished to ensure that *when* the topic was taught, students would receive "'all of the evidence.'" *Ante,* at 586 (quoting Tr. of Oral Arg. 60).

As originally introduced, the "purpose" section of the Balanced Treatment Act read: "This Chapter is enacted for the purposes of protecting academic freedom . . . *of students . . .* and assisting *students* in their search for truth." 1 App. E–292 (emphasis added). Among the proposed findings of fact contained in the original version of the bill was the following: "Public school instruction in only evolution-science . . . *violates the principle of academic freedom because it denies students a choice between scientific models and instead indoctrinates them in evolution science alone."* *Id.,* at E–295 (emphasis added).[5] Senator Keith unquestionably understood "academic freedom" to mean "freedom from indoctrination." See *id.,* at E–36 (purpose of bill is "to protect academic freedom by providing student choice"); *id.,* at E–283 (purpose of bill is to protect "academic freedom" by giving students a "choice" rather than subjecting them to "indoctrination on origins").

If one adopts the obviously intended meaning of the statutory term "academic freedom," there is no basis whatever for concluding that the purpose they express is a "sham." *Ante,*

---

[5] The majority finds it "astonishing" that I would cite a portion of Senator Keith's original bill that was later deleted as evidence of the legislature's understanding of the phrase "academic freedom." *Ante,* at 589, n. 8. What is astonishing is the majority's implication that the deletion of that section deprives it of value as a clear indication of what the phrase meant—there and in the other, retained, sections of the bill. The Senate Committee on Education deleted most of the lengthy "purpose" section of the bill (with Senator Keith's consent) because it resembled legislative "findings of fact," which, committee members felt, should generally not be incorporated in legislation. The deletion had absolutely nothing to do with the manner in which the section described "academic freedom." See 1 App. E–314—E–320; *id.,* at E–440—E–442.

at 587. To the contrary, the Act pursues that purpose plainly and consistently. It requires that, whenever the subject of origins is covered, evolution be "taught as a theory, rather than as proven scientific fact" and that scientific evidence inconsistent with the theory of evolution (viz., "creation science") be taught as well. La. Rev. Stat. Ann. § 17:286.4A (West 1982). Living up to its title of *"Balanced Treatment for Creation-Science and Evolution-Science Act,"* § 17.286.1, it treats the teaching of creation the same way. It does *not* mandate instruction in creation science, § 17:286.5; *forbids* teachers to present creation science "as proven scientific fact," § 17:286.4A; and *bans* the teaching of creation science unless the theory is (to use the Court's terminology) "discredit[ed] '. . . at every turn'" with the teaching of evolution. *Ante,* at 589 (quoting 765 F. 2d, at 1257). It surpasses understanding how the Court can see in this a purpose "to restructure the science curriculum to conform with a particular religious viewpoint," *ante,* at 593, "to provide a persuasive advantage to a particular religious doctrine," *ante,* at 592, "to promote the theory of creation science which embodies a particular religious tenet," *ante,* at 593, and "to endorse a particular religious doctrine," *ante,* at 594.

The Act's reference to "creation" is not convincing evidence of religious purpose. The Act defines creation science as *"scientific evidenc[e],"* § 17:286.3(2) (emphasis added), and Senator Keith and his witnesses repeatedly stressed that the subject can and should be presented without religious content. See *supra,* at 623. We have no basis on the record to conclude that creation science need be anything other than a collection of scientific data supporting the theory that life abruptly appeared on earth. See n. 4, *supra.* Creation science, its proponents insist, no more must explain *whence* life came than evolution must explain whence came the inanimate materials from which it says life evolved. But even if that were not so, to posit a past creator is not to posit the eternal and personal God who is the object of religious veneration.

Indeed, it is not even to posit the *"unmoved* mover" hypothesized by Aristotle and other notably nonfundamentalist philosophers. Senator Keith suggested this when he referred to "a creator *however you define a creator."* 1 App. E–280 (emphasis added).

The Court cites three provisions of the Act which, it argues, demonstrate a "discriminatory preference for the teaching of creation science" and no interest in "academic freedom." *Ante*, at 588. First, the Act prohibits discrimination only against creation scientists and those who teach creation science. § 17:286.4C. Second, the Act requires local school boards to develop and provide to science teachers "a curriculum guide on presentation of creation-science." § 17:286.7A. Finally, the Act requires the Governor to designate seven creation scientists who shall, upon request, assist local school boards in developing the curriculum guides. § 17:286.7B. But none of these provisions casts doubt upon the sincerity of the legislators' articulated purpose of "academic freedom"—unless, of course, one gives that term the obviously erroneous meanings preferred by the Court. The Louisiana legislators had been told repeatedly that creation scientists were scorned by most educators and scientists, who themselves had an almost religious faith in evolution. It is hardly surprising, then, that in seeking to achieve a balanced, "nonindoctrinating" curriculum, the legislators protected from discrimination only those teachers whom they thought were *suffering* from discrimination. (Also, the legislators were undoubtedly aware of *Epperson* v. *Arkansas*, 393 U. S. 97 (1968), and thus could quite reasonably have concluded that discrimination against evolutionists was already prohibited.) The two provisions respecting the development of curriculum guides are also consistent with "academic freedom" as the Louisiana Legislature understood the term. Witnesses had informed the legislators that, because of the hostility of most scientists and educators to creation science, the topic had been censored from or badly misrepresented in elementary

and secondary school texts. In light of the unavailability of works on creation science suitable for classroom use (a fact appellees concede, see Brief for Appellees 27, 40) and the existence of ample materials on evolution, it was entirely reasonable for the legislature to conclude that science teachers attempting to implement the Act would need a curriculum guide on creation science, but not on evolution, and that those charged with developing the guide would need an easily accessible group of creation scientists. Thus, the provisions of the Act of so much concern to the Court *support* the conclusion that the legislature acted to advance "academic freedom."

The legislative history gives ample evidence of the sincerity of the Balanced Treatment Act's articulated purpose. Witness after witness urged the legislators to support the Act so that students would not be "indoctrinated" but would instead be free to decide for themselves, based upon a fair presentation of the scientific evidence, about the origin of life. See, *e. g.*, 1 App. E–18 (Sunderland) ("all that we are advocating" is presenting "scientific data" to students and "letting [them] make up their own mind[s]"); *id.*, at E–19–E–20 (Sunderland) (Students are now being "indoctrinated" in evolution through the use of "censored school books. . . . All that we are asking for is [the] open unbiased education in the classroom . . . your students deserve"); *id.*, at E–21 (Morris) ("A. student cannot [make an intelligent decision about the origin of life] unless he is well informed about both [evolution and creation science]"); *id.*, at E–22 (Sanderford) ("We are asking very simply [that] . . . creationism [be presented] alongside . . . evolution and let people make their own mind[s] up"); *id.*, at E–23 (Young) (the bill would require teachers to live up to their "obligation to present all theories" and thereby enable "students to make judgments themselves"); *id.*, at E–44 (Boudreaux) ("Our intention is truth and as a scientist, I am interested in truth"); *id.*, at E–60–E–61 (Boudreaux) ("[W]e [teachers] are guilty of a lot of

brainwashing. . . . We have a duty to . . . [present the] truth" to students "at all levels from gradeschool on through the college level"); *id.*, at E–79 (Kalivoda) ("This [hearing] is being held I think to determine whether children will benefit from freedom of information or if they will be handicapped educationally by having little or no information about creation"); *id.*, at E–80 (Kalivoda) ("I am not interested in teaching religion in schools. . . . I am interested in the truth and [students] having the opportunity to hear more than one side"); *id.*, at E–98 (Reiboldt) ("The students have a right to know there is an alternate creationist point of view. They have a right to know the scientific evidences which suppor[t] that alternative"); *id.*, at E–218 (Young statement) (passage of the bill will ensure that "communication of scientific ideas and discoveries may be unhindered"); 2 *id.*, at E–514 (Morris) ("[A]re we going to allow [students] to look at evolution, to look at creationism, and to let one or the other stand or fall on its own merits, or will we by failing to pass this bill . . . deny students an opportunity to hear another viewpoint?"); *id.*, at E–516—E–517 (Young) ("We want to give the children here in this state an equal opportunity to see both sides of the theories"). Senator Keith expressed similar views. See, *e. g.*, 1 *id.*, at E–36; *id.*, at E–41; *id.*, at E–280; *id.*, at E–283.

Legislators other than Senator Keith made only a few statements providing insight into their motives, but those statements cast no doubt upon the sincerity of the Act's articulated purpose. The legislators were concerned primarily about the manner in which the subject of origins was presented in Louisiana schools—specifically, about whether scientifically valuable information was being censored and students misled about evolution. Representatives Cain, Jenkins, and F. Thompson seemed impressed by the scientific evidence presented in support of creation science. See 2 *id.*, at E–530 (Rep. F. Thompson); *id.*, at E–533 (Rep. Cain); *id.*, at E–613 (Rep. Jenkins). At the first study commission hearing, Senator Picard and Representative M. Thompson ques-

tioned Senator Keith about Louisiana teachers' treatment of evolution and creation science. See 1 *id.*, at E–71—E–74. At the close of the hearing, Representative M. Thompson told the audience:

> "We as members of the committee will also receive from the staff information of what is currently being taught in the Louisiana public schools. We really want to see [it]. I . . . have no idea in what manner [biology] is presented and in what manner the creationist theories [are] excluded in the public school[s]. We want to look at what the status of the situation is." *Id.*, at E–104.

Legislators made other comments suggesting a concern about censorship and misrepresentation of scientific information. See, *e. g.*, *id.*, at E–386 (Sen. McLeod); 2 *id.*, at E–527 (Rep. Jenkins); *id.*, at E–528 (Rep. M. Thompson); *id.*, at E–534 (Rep. Fair).

It is undoubtedly true that what prompted the legislature to direct its attention to the misrepresentation of evolution in the schools (rather than the inaccurate presentation of other topics) was its awareness of the tension between evolution and the religious beliefs of many children. But even appellees concede that a valid secular purpose is not rendered impermissible simply because its pursuit is prompted by concern for religious sensitivities. Tr. of Oral Arg. 43, 56. If a history teacher falsely told her students that the bones of Jesus Christ had been discovered, or a physics teacher that the Shroud of Turin had been conclusively established to be inexplicable on the basis of natural causes, I cannot believe (despite the majority's implication to the contrary, see *ante*, at 592–593) that legislators or school board members would be constitutionally prohibited from taking corrective action, simply because that action was prompted by concern for the religious beliefs of the misinstructed students.

In sum, even if one concedes, for the sake of argument, that a majority of the Louisiana Legislature voted for the Balanced Treatment Act partly in order to foster (rather

than merely eliminate discrimination against) Christian fundamentalist beliefs, our cases establish that that alone would not suffice to invalidate the Act, so long as there was a genuine secular purpose as well. We have, moreover, no adequate basis for disbelieving the secular purpose set forth in the Act itself, or for concluding that it is a sham enacted to conceal the legislators' violation of their oaths of office. I am astonished by the Court's unprecedented readiness to reach such a conclusion, which I can only attribute to an intellectual predisposition created by the facts and the legend of *Scopes* v. *State*, 154 Tenn. 105, 289 S. W. 363 (1927)—an instinctive reaction that any governmentally imposed requirements bearing upon the teaching of evolution must be a manifestation of Christian fundamentalist repression. In this case, however, it seems to me the Court's position is the repressive one. The people of Louisiana, including those who are Christian fundamentalists, are quite entitled, as a secular matter, to have whatever scientific evidence there may be against evolution presented in their schools, just as Mr. Scopes was entitled to present whatever scientific evidence there was for it. Perhaps what the Louisiana Legislature has done is unconstitutional because there *is* no such evidence, and the scheme they have established will amount to no more than a presentation of the Book of Genesis. But we cannot say that on the evidence before us in this summary judgment context, which includes ample uncontradicted testimony that "creation science" is a body of scientific knowledge rather than revealed belief. *Infinitely less* can we say (or should we say) that the scientific evidence for evolution is so conclusive that no one could be gullible enough to believe that there is any real scientific evidence to the contrary, so that the legislation's stated purpose must be a lie. Yet that illiberal judgment, that *Scopes*-in-reverse, is ultimately the basis on which the Court's facile rejection of the Louisiana Legislature's purpose must rest.

Since the existence of secular purpose is so entirely clear, and thus dispositive, I will not go on to discuss the fact that, even if the Louisiana Legislature's purpose were exclusively to advance religion, some of the well-established exceptions to the impermissibility of that purpose might be applicable — the validating intent to eliminate a perceived discrimination against a particular religion, to facilitate its free exercise, or to accommodate it. See *supra*, at 617–618. I am not in any case enamored of those amorphous exceptions, since I think them no more than unpredictable correctives to what is (as the next Part of this opinion will discuss) a fundamentally unsound rule. It is surprising, however, that the Court does not address these exceptions, since the context of the legislature's action gives some reason to believe they may be applicable.[6]

---

[6] As the majority recognizes, *ante*, at 592, Senator Keith sincerely believed that "secular humanism is a bona fide religion," 1 App. E–36; see also *id.*, at E–418; 2 *id.*, at E–499, and that "evolution is the cornerstone of that religion," 1 *id.*, at E–418; see also *id.*, at E–282; *id.*, at E–312 — E–313; *id.*, at E–317; 2 *id.*, at E–499. The Senator even told his colleagues that this Court had "held" that secular humanism was a religion. See 1 *id.*, at E–36, *id.*, at E–418; 2 *id.*, at E–499. (In *Torcaso* v. *Watkins*, 367 U. S. 488, 495, n. 11 (1961), we did indeed refer to "Secular Humanism" as a "religio[n].") Senator Keith and his supporters raised the "religion" of secular humanism *not*, as the majority suggests, to explain the source of their "disdain for the theory of evolution," *ante*, at 592, but to convince the legislature that the State of Louisiana was *violating the Establishment Clause* because its teachers were misrepresenting evolution as fact and depriving students of the information necessary to question that theory. 1 App. E–2 — E–4 (Sen. Keith); *id.*, at E–36 — E–37, E–39 (Sen. Keith); *id.*, at E–154 — E–155 (Boudreaux paper); *id.*, at E–281 — E–282 (Sen. Keith); *id.*, at E–317 (Sen. Keith); 2 *id.*, at E–499 — E–500 (Sen. Keith). The Senator repeatedly urged his colleagues to pass his bill to *remedy* this Establishment Clause violation by ensuring state neutrality in religious matters, see, *e. g.*, 1 *id.*, at E–36; *id.*, at E–39; *id.*, at E–313, surely a permissible purpose under *Lemon*. Senator Keith's argument may be questionable, but nothing in the statute or its legislative history gives us reason to doubt his sincerity or that of his supporters.

Because I believe that the Balanced Treatment Act had a secular purpose, which is all the first component of the *Lemon* test requires, I would reverse the judgment of the Court of Appeals and remand for further consideration.

## III

I have to this point assumed the validity of the *Lemon* "purpose" test. In fact, however, I think the pessimistic evaluation that THE CHIEF JUSTICE made of the totality of *Lemon* is particularly applicable to the "purpose" prong: it is "a constitutional theory [that] has no basis in the history of the amendment it seeks to interpret, is difficult to apply and yields unprincipled results . . . ." *Wallace* v. *Jaffree*, 472 U. S., at 112 (REHNQUIST, J., dissenting).

Our cases interpreting and applying the purpose test have made such a maze of the Establishment Clause that even the most conscientious governmental officials can only guess what motives will be held unconstitutional. We have said essentially the following: Government may not act with the purpose of advancing religion, except when forced to do so by the Free Exercise Clause (which is now and then); or when eliminating existing governmental hostility to religion (which exists sometimes); or even when merely accommodating governmentally uninhibited religious practices, except that at some point (it is unclear where) intentional accommodation results in the fostering of religion, which is of course unconstitutional. See *supra*, at 614–618.

But the difficulty of knowing what vitiating purpose one is looking for is as nothing compared with the difficulty of knowing how or where to find it. For while it is possible to discern the objective "purpose" of a statute (*i. e.*, the public good at which its provisions appear to be directed), or even the formal motivation for a statute where that is explicitly set forth (as it was, to no avail, here), discerning the subjective motivation of those enacting the statute is, to be honest, almost always an impossible task. The number of possible

motivations, to begin with, is not binary, or indeed even finite. In the present case, for example, a particular legislator need not have voted for the Act either because he wanted to foster religion or because he wanted to improve education. He may have thought the bill would provide jobs for his district, or may have wanted to make amends with a faction of his party he had alienated on another vote, or he may have been a close friend of the bill's sponsor, or he may have been repaying a favor he owed the majority leader, or he may have hoped the Governor would appreciate his vote and make a fundraising appearance for him, or he may have been pressured to vote for a bill he disliked by a wealthy contributor or by a flood of constituent mail, or he may have been seeking favorable publicity, or he may have been reluctant to hurt the feelings of a loyal staff member who worked on the bill, or he may have been settling an old score with a legislator who opposed the bill, or he may have been mad at his wife who opposed the bill, or he may have been intoxicated and utterly *un*motivated when the vote was called, or he may have accidentally voted "yes" instead of "no," or, of course, he may have had (and very likely did have) a combination of some of the above and many other motivations. To look for *the sole purpose* of even a single legislator is probably to look for something that does not exist.

Putting that problem aside, however, where ought we to look for the individual legislator's purpose? We cannot of course assume that every member present (if, as is unlikely, we know who or even how many they were) agreed with the motivation expressed in a particular legislator's preenactment floor or committee statement. Quite obviously, "[w]hat motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *United States* v. *O'Brien*, 391 U. S. 367, 384 (1968). Can we assume, then, that they all agree with the motivation expressed in the staff-prepared committee reports they might have read—even though we are unwilling to

assume that they agreed with the motivation expressed in the very statute that they voted for? Should we consider postenactment floor statements? Or postenactment testimony from legislators, obtained expressly for the lawsuit? Should we consider media reports on the realities of the legislative bargaining? All of these sources, of course, are eminently manipulable. Legislative histories can be contrived and sanitized, favorable media coverage orchestrated, and postenactment recollections conveniently distorted. Perhaps most valuable of all would be more objective indications — for example, evidence regarding the individual legislators' religious affiliations. And if that, why not evidence regarding the fervor or tepidity of their beliefs?

Having achieved, through these simple means, an assessment of what individual legislators intended, we must still confront the question (yet to be addressed in any of our cases) how *many* of them must have the invalidating intent. If a state senate approves a bill by vote of 26 to 25, and only one of the 26 intended solely to advance religion, is the law unconstitutional? What if 13 of the 26 had that intent? What if 3 of the 26 had the impermissible intent, but 3 of the 25 voting against the bill were motivated by religious hostility or were simply attempting to "balance" the votes of their impermissibly motivated colleagues? Or is it possible that the intent of the bill's sponsor is alone enough to invalidate it — on a theory, perhaps, that even though everyone else's intent was pure, what they produced was the fruit of a forbidden tree?

Because there are no good answers to these questions, this Court has recognized from Chief Justice Marshall, see *Fletcher* v. *Peck*, 6 Cranch 87, 130 (1810), to Chief Justice Warren, *United States* v. *O'Brien, supra,* at 383–384, that determining the subjective intent of legislators is a perilous enterprise. See also *Palmer* v. *Thompson*, 403 U. S. 217, 224–225 (1971); *Epperson* v. *Arkansas*, 393 U. S., at 113 (Black, J., concurring). It is perilous, I might note, not just for the judges who will very likely reach the wrong result,

but also for the legislators who find that they must assess the validity of proposed legislation—and risk the condemnation of having voted for an unconstitutional measure—not on the basis of what the legislation contains, nor even on the basis of what they themselves intend, but on the basis of what *others* have in mind.

Given the many hazards involved in assessing the subjective intent of governmental decisionmakers, the first prong of *Lemon* is defensible, I think, only if the text of the Establishment Clause demands it. That is surely not the case. The Clause states that "Congress shall make no law respecting an establishment of religion." One could argue, I suppose, that any time Congress acts with the *intent* of advancing religion, it has enacted a "law respecting an establishment of religion"; but far from being an unavoidable reading, it is quite an unnatural one. I doubt, for example, that the Clayton Act, 38 Stat. 730, as amended, 15 U. S. C. § 12 *et seq.*, could reasonably be described as a "law respecting an establishment of religion" if bizarre new historical evidence revealed that it lacked a secular purpose, even though it has no discernible nonsecular effect. It is, in short, far from an inevitable reading of the Establishment Clause that it forbids all governmental action intended to advance religion; and if not inevitable, any reading with such untoward consequences must be wrong.

In the past we have attempted to justify our embarrassing Establishment Clause jurisprudence[7] on the ground that it

---

[7]Professor Choper summarized our school aid cases thusly:

"[A] provision for therapeutic and diagnostic health services to parochial school pupils by public employees is invalid if provided *in* the parochial school, but not if offered at a neutral site, even if in a mobile unit adjacent to the parochial school. Reimbursement to parochial schools for the expense of administering teacher-prepared tests required by state law is invalid, but the state may reimburse parochial schools for the expense of administering state-prepared tests. The state may lend school textbooks to parochial school pupils because, the Court has explained, the books can be checked in advance for religious content and are 'self-policing'; but the

"sacrifices clarity and predictability for flexibility." *Committee for Public Education & Religious Liberty* v. *Regan*, 444 U. S., at 662. One commentator has aptly characterized this as "a euphemism . . . for . . . the absence of any principled rationale." Choper, *supra* n. 7, at 681. I think it time that we sacrifice some "flexibility" for "clarity and predictability." Abandoning *Lemon*'s purpose test—a test which exacerbates the tension between the Free Exercise and Establishment Clauses, has no basis in the language or history of the Amendment, and, as today's decision shows, has wonderfully flexible consequences—would be a good place to start.

---

state may not lend other seemingly self-policing instructional items such as tape recorders and maps. The state may pay the cost of bus transportation to parochial schools, which the Court has ruled are 'permeated' with religion; but the state is forbidden to pay for field trip transportation visits 'to governmental, industrial, cultural, and scientific centers designed to enrich the secular studies of students.'" Choper, The Religion Clauses of the First Amendment: Reconciling the Conflict, 41 U. Pitt. L. Rev. 673, 680–681 (1980) (footnotes omitted).

Since that was written, more decisions on the subject have been rendered, but they leave the theme of chaos securely unimpaired. See, *e. g.*, *Aguilar* v. *Felton*, 473 U. S. 402 (1985); *Grand Rapids School District* v. *Ball*, 473 U. S. 373 (1985).