

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

8-10-1998

# Edwards v. California Univ PA

Precedential or Non-Precedential:

Docket 97-3285

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Edwards v. California Univ PA" (1998). *1998 Decisions.* Paper 191.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/191

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed August 10, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-3285

DILAWAR M. EDWARDS, Ph.D.
Appellant

v.

CALIFORNIA UNIVERSITY OF PENNSYLVANIA;
JOHN PIERCE WATKINS, Ph.D., President;
NANCY Z. NELSON, Ed.D., Vice President for Academic
Affairs; WILLIAM BENEDETTI, Ed.D., Dean in their
official capacities; DAVID CAMPBELL, Chairperson,
Educational Studies Dept.

ON APPEAL FROM THE
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
(D.C. Civil No. 91-01668)

Argued: March 13, 1998

Before: STAPLETON and ALITO, Circuit Judges,
and O'KELLEY, District Judge*

(Opinion Filed: August 10, 1998)

_____
* Hon. William C. O'Kelley, United States District Judge for the Northern
District of Georgia, sitting by designation.

CRAIG L. PARSHALL (Argued)
Suite 202
910 Princess Anne Street
Fredericksburg, VA 22401

EUGENE ORLANDO, JR.
Orlando & Strahn
5341 Perkiomen Avenue
Reading, PA 19606

Counsel for Appellant

THOMAS F. HALLORAN, JR.
  (Argued)
6th Floor
Office of Attorney General of
 Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219

Counsel for Appellees

OPINION OF THE COURT

ALITO, Circuit Judge:

Appellant Dilawar M. Edwards, a tenured professor at the California University of Pennsylvania, brought this action pursuant to 42 U.S.C. S 1983, alleging that the University and its officers ("the University") violated several of his constitutional rights. Specifically, Edwards claimed that the University deprived him of his rights to free speech, due process, and equal protection by restricting his choice of classroom materials, criticizing his teaching performance, and suspending him with pay for a portion of one academic term. In addition, Edwards alleged that the University retaliated against him for filing this lawsuit.

Prior to trial, the district court dismissed Edwards's equal protection claim and granted summary judgment in favor of the University on Edwards's due process claim. The case then went to trial on Edwards's First Amendment and retaliation claims, and a jury returned a verdict for the

2

University. On appeal, Edwards assigns as error: 1) the district court's First Amendment jury instruction; 2) the district court's grant of summary judgment on his due process claim; 3) the district court's dismissal of his equal protection claim; 4) the district court's ruling that the verdict was not against the great weight of the evidence; and 5) the district court's decision not to permit a third amended complaint. We affirm.

I.

During the time-period at issue in this case, Professor Edwards taught a course at the University entitled "Introduction to Educational Media" (IEM). Syllabi from the early 1980s indicate that the IEM course initially focused on how teachers can effectively use various classroom tools, such as projection equipment, chalkboards, photographs, and films. See App. I at 299-306. Later syllabi prepared by Edwards, however, included a new emphasis on issues of bias, censorship, religion, and humanism, and Edwards listed numerous publications concerning these issues as required or suggested reading. Id. at 307-37.

In May 1989, one of Edwards's students complained to University officials that Edwards had used the IEM class to advance religious ideas. On August 14, 1989, the University's Vice President for Academic Affairs, Nancy Nelson, wrote a letter to Edwards in which she outlined the student's concerns and indicated that a meeting on the issue would be held in the fall. Nelson met with Edwards and other school officials to discuss the complaint and, on November 28, 1989, Nelson wrote to Edwards and directed that he "cease and desist" from using "doctrinaire material[s]" of a religious nature. App. I at 366. Edwards appealed this decision to the President of the University, John Pierce Watkins, and the two exchanged letters through July 1990. Watkins expressed his approval of Nelson's actions and directed Edwards to avoid advancing religious beliefs through his lectures and handouts. Dr. Edwards continued to teach the IEM course during the 1991 and 1992 school years.

In 1992, Professor David Campbell was named chair of the Education Department at the University. Upon

3

assuming this position, Campbell became concerned that Edwards had "interjected something that didn't belong in the [IEM] course[:] A distinct bias on religion and religious questions." App. II, Trial Tr. 2/13/97, at 38. After concluding that Edwards was teaching from a non-approved syllabus, Campbell brought the issue to the department faculty during the Spring 1993 term, and the faculty voted to reinstate an earlier version of the IEM syllabus. Relying on the earlier syllabus, Campbell revoked certain book orders that Edwards had made for the Fall 1993 semester and, when Edwards objected, Campbell told him that he could put the matter on the agenda for the September 1993 faculty meeting. Campbell testified that Edwards never asked that the matter be placed on the meeting's agenda.

In the weeks prior to the Fall 1993 term, Professor Edwards's schedule was rearranged, and he was assigned to teach an additional course -- "Educational Tests and Measurements" (ETM) -- that he had never taught. Edwards was dissatisfied with the change, and Campbell received complaints that Edwards failed to attend some of his ETM classes and walked out of others. At the September 1993 faculty meeting, Campbell and Edwards engaged in an exchange in which Campbell called Edwards an "embarrassment to the department" and made comments to the effect that Edwards might be better suited to a "fundamentalist college[ ]" than a "public university." App. I at 391, 400. A non-verbatim account of the meeting was distributed to all members of the Education Department.

In response to the student complaints about Edwards's ETM class, school administrators put together a packet of materials that they wished to discuss with Edwards. The administration scheduled a meeting for Monday, October 25, 1993, but apparently did not mail the packet to Edwards until Friday, October 22, 1993. Upon arriving at the meeting, Edwards stated that he had not received any materials in the mail and he asked for additional time to prepare. App. I at 408-10. At this point, Nancy Nelson relieved Edwards of his duties, with pay, until he was ready to discuss the University's concerns. Id. at 411. Edwards

remained suspended with pay for the remainder of the semester but returned to the classroom for the Spring 1994 term to teach two ETM courses and one IEM course.

Edwards initially brought suit against the University in September 1991, alleging violations of his First Amendment free speech rights, his Fourteenth Amendment due process rights, and his rights under the Establishment Clause. In October 1991, Edwards filed an amended complaint which included an equal protection claim. After his suspension in 1993, Edwards filed a second amended complaint which contained a free speech claim, a retaliation claim, a due process claim, and an equal protection claim. The district court granted summary judgment on Edwards's due process claim in January 1997, and the court denied Edwards's motion for reconsideration in February 1997. On February 11, 1997, the first day of trial, the district sua sponte dismissed Edwards's equal protection claim for failure to state a claim and denied Edwards's motion to file a third amended complaint. The case then went to trial on Edwards's First Amendment and retaliation claims.

Before submitting the case to the jury, the district court held a conference on jury instructions and rejected much of Edwards's proposed First Amendment instruction. After the jury returned a verdict for the University, Edwards moved for a new trial. The district court denied Edwards's motion, and Edwards appealed.

II.

A.

Edwards first contends that the district court inadequately instructed the jury on the issue of whether the University violated his First Amendment rights by restricting his "choice of curriculum materials and the content and subjects of his classes." Appellant's Br. at 27. Although Edwards agrees with the standard given by the district court -- that the University had to show that its actions were "reasonably related to a legitimate educational interest," App. IV, Trial Tr. Feb. 25, 1997, at 26 -- Edwards argues that the district court did not adequately explain

5

this standard and, thus, "permitted the jury to speculate on the parameters of freedom of speech." Appellant's Br. at 24. Specifically, Edwards contends that the district court failed to provide guidance in the following four areas: 1) the necessity of avoiding viewpoint discrimination; 2) the strength of a professor's academic freedom rights; 3) the correct legal standard regarding the discussion of religious issues in public classrooms; and 4) the existence of a professor's right to choose his curriculum materials absent an official school policy.

We do not find it necessary to determine whether the district court's instruction adequately defined the "reasonably related to a legitimate educational interest" standard because, as a threshold matter, we conclude that a public university professor does not have a First Amendment right to decide what will be taught in the classroom. This conclusion is compelled by our decision in Bradley v. Pittsburgh Bd. of Educ., 910 F.2d 1172 (3d Cir. 1990), where we explained that "no court has found that teachers' First Amendment rights extend to choosing their own curriculum or classroom management techniques in contravention of school policy or dictates." Id. at 1176. Consistent with this observation, we concluded that "[a]lthough a teacher's out-of-class conduct, including her advocacy of particular teaching methods, is protected, her in-class conduct is not." Id. (citation omitted).[1] Therefore, although Edwards has a right to advocate outside of the classroom for the use of certain curriculum materials, he does not have a right to use those materials in the classroom. Accord Boring v. Buncombe County Bd. of Educ.,

_____

1. Edwards interprets Bradley as holding that "in the absence of an official existing school policy prohibiting" a professor from selecting certain classroom materials, a professor has a First Amendment right to choose his curriculum materials. See Appellant's Br. at 28. This interpretation ignores: 1) the Bradley court's instruction that public school teachers must abide by "school policy or dictates" when choosing their curriculum, 910 F.2d at 1176 (emphasis added); 2) the court's broad conclusion that a public school teacher's "in class conduct is not" protected by the First Amendment, id.; and 3) the fact that the school in Bradley, like the University here, took action without establishing an official policy. Id. at 1174.

6

136 F.3d 364, 370 (4th Cir. 1998) (in banc) ("We agree . . . that the school, not the teacher, has the right tofix the curriculum."); Kirkland v. Northside Indep. Sch. Dist., 890 F.2d 794, 800 (5th Cir. 1989) ("Although the concept of academic freedom has been recognized in our jurisprudence, the doctrine has never conferred upon teachers the control of public school curricula."). But see Bishop v. Aronov, 926 F.2d 1066, 1075 (11th Cir. 1991) (finding that a public university's restrictions on a professor's in-class speech "implicate[d] First Amendment freedoms").

Our conclusion that the First Amendment does not place restrictions on a public university's ability to control its curriculum is consistent with the Supreme Court's jurisprudence concerning the state's ability to say what it wishes when it is the speaker. The following passage from Rosenberger v. University of Virginia, 515 U.S. 819 (1995), addresses this issue in the university context:

> [W]hen the State is the speaker, it may make content-based choices. When the University determines the content of the education it provides, it is the University speaking, and we have permitted the government to regulate the content of what is or is not expressed when it is the speaker or when it enlists private entities to convey its own message. . . . It does not follow, however, . . . that viewpoint-based restrictions are proper when the University does not speak itself or subsidize transmittal of a message it favors but instead expends funds to encourage a diversity of views from private speakers. A holding that the University may not discriminate based on viewpoint of private persons whose speech it facilitates does not restrict the University's own speech, which is controlled by different principles.

Id. at 833-34. Since the University's actions in the instant case concerned the "content of the education it provides," id. at 833, we find that the University was acting as speaker and was entitled to make content-based choices in restricting Edwards's syllabus.

Edwards's reliance on the principle of academic freedom

7

does not affect our conclusion that the University can make content-based decisions when shaping its curriculum. The Supreme Court has explained that "[a]cademic freedom thrives not only on the independent and uninhibited exchange of ideas among teachers and students, but also, and somewhat inconsistently, on autonomous decisionmaking by the academy itself." Regents of Univ. of Michigan v. Ewing, 474 U.S. 214, 226 n.12 (citations omitted). The "four essential freedoms" that constitute academic freedom have been described as a university's freedom to choose "who may teach, what may be taught, how it shall be taught, and who may be admitted to study." Regents of Univ. of California v. Bakke, 438 U.S. 265, 312 (1978) (opinion of Powell, J.) (quotations omitted). 2 In sum, caselaw from the Supreme Court and this court on academic freedom and the First Amendment compel the conclusion that Edwards does not have a constitutional right to choose curriculum materials in contravention of the University's dictates. Accordingly, we affirm the district court's decision not to grant a new trial on this issue.

B.

Edwards's second contention is that the district court erred when it granted summary judgment for the University on his procedural due process claim. The district court initially ruled on this issue prior to trial, concluding that, "because Edwards was suspended with pay, he cannot prove that he was deprived of a property interest deserving due process guarantees." App. I at 138. Edwards moved for reconsideration on the ground that the district court's opinion did not adequately consider whether he had been deprived of a liberty interest. The district court denied

_____

2. Edwards's contention that the Supreme Court has elsewhere defined academic freedom as the "principle that individual instructors are at liberty to teach that which they deem to be appropriate," Appellant's Br. at 31, is incorrect. The case cited for this proposition, Edwards v. Aguillard, 482 U.S. 578 (1987), reaches no such conclusion. Rather, the passage relied upon by Edwards simply describes the conclusion of the court of appeals in that case. Id. 586 n.6. At no point in Aguillard, which
is an Establishment Clause case, does the Court define academic freedom for purposes of the Free Speech Clause.

8

Edwards's motion, explaining that he had not "pleaded facts sufficient to make out a liberty interest claim regarding reputation." App. II, Feb. 12, 1997 Trial Tr. at 12. We agree.

This court has previously held that "[s]tigma to reputation alone, absent some accompanying deprivation of present or future employment, is not a liberty interest protected by the fourteenth amendment." Robb v. City of Philadelphia, 733 F.2d 286, 294 (3d Cir. 1984). See also Strum v. Clark, 835 F.2d 1009, 1012 (3d Cir. 1987) (explaining that the Supreme Court has required "both damage to reputation and the extinguishment of government employment as a predicate for due process protection."). Since it is undisputed that Edwards remained employed with pay at all times relevant to this case, his claim is barred by our decisions in Robb and Strum. While Edwards's temporary removal from class duties may have further stigmatized him, this action does not constitute a deprivation of employment. Therefore, we will affirm the district court's grant of summary judgment on Edwards's due process claim.

C.

Edwards next contends that the district court improperly dismissed his equal protection claim. In making this argument, Edwards places considerable reliance on facts that came out at trial. See Appellant's Br. at 42; Appellant's Reply Br. at 18. However, the district court dismissed Edwards's equal protection claim prior to trial because Edwards's counsel admitted that the second amended complaint did not adequately allege an equal protection violation. See App. II, Feb. 11, 1997 Trial Tr. at 9-10, 74-75.3

_____

3. The relevant exchange between the district court and Edwards's trial counsel, Jack Parson, proceeded as follows:

> The Court:  What do you think you need to do to make out an equal protection claim, don't you have to show persons similarly situated were treated in a different manner because of participation in a protected class?

> Mr. Carson: That's the criteria.

9

Under these circumstances, Edwards is not entitled to revive his equal protection claim on appeal.

D.

Edwards's final two contentions -- that the verdict was against the great weight of the evidence and that he should have been allowed to file a third amended complaint on the first day of trial -- are both without merit. Accordingly, we affirm the district court's resolution of both issues.

III.

In sum, we conclude: 1) that Professor Edwards does not have a First Amendment right to choose classroom materials and subjects in contravention of the University's dictates; 2) that Edwards failed to state a procedural due process liberty claim because he did not allege a deprivation of employment; and 3) that the district court properly dismissed Edwards's equal protection claim after Edwards's own counsel conceded that the complaint failed to adequately state such a claim. We find Edwards's remaining arguments on appeal to be without merit. Accordingly, we affirm. We emphasize that we only pass on the narrow legal issues presented to us. Nothing in our opinion should be read to mean that we condone all of the conduct of the University officials that was revealed at trial.

_____

The Court:  Where's that allegation?

Mr. Carson: In this amended complaint, it is not there, not specifically set out.

The Court:  This is the complaint. Okay. You are saying no equal protection argument in the second amended complaint?

Mr. Carson: No, Your Honor.

The Court:  There is none?

Mr. Carson: No.

App. II, Feb. 11, 1997 Trial Tr. at 9-10.

10

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

11